Roy BARSH, Sole Trader, d/b/a Roy Barsh Truck Line, and American Fidelity & Casualty Company, Inc., a Corp. of Richmond, Va., and Kerr Glass Manufacturing Corporation, Plaintiffs in Error,

v.

H. L. MULLINS, Administrator of the Estate of Melvin FISHER, Deceased, Defendant in Error.

No. 37792.

Supreme Court of Oklahoma.

Jan. 9, 1959.

Dissenting Opinion Jan. 10, 1959.

Rehearing Denied April 14, 1959.

Application for Leave to File Second Petition for Rehearing Denied May 12, 1959.

Rucker, Tabor & Cox, Tulsa, Welcome D. Pierson, Oklahoma City, for plaintiffs in error.

Rainey & Barksdale, George B. Inglish, Okmulgee, Arthurs & Blackstock, Bristow, ·for defendant in error.

JACKSON, Justice.

This is an action by H. L. Mullins, administrator of the estate of Melvin Fisher, deceased, to recover damages for wrongful death and for damages inuring to the benefit of deceased's estate.

Death resulted from a collision between an automobile driven by deceased and a truck driven by Thomas Hall, who was an employee of John and Obie Barsh, d/b/a Barsh Produce Company. However, neither Hall, John Barsh nor Obie Barsh are parties to this action. Plaintiff's predecessor settled with these parties and executed a release and convenant not to sue in their favor. Four other parties were also included in the release. The material defendants in this action are Kerr Glass Manufacturing Corporation and Roy Barsh, d/b/a Roy Barsh Truck Lines. Plaintiff seeks recovery from said defendants on the grounds that at the time of the accident Hall, the driver of the truck, and Barsh Produce Company were engaged in carrying out a conspiracy in which Barsh Produce Company and each of said defendants were co-conspirators.

Defendant Kerr is a shipper. Defendant Roy Barsh is a public carrier for hire, duly licensed by the Interstate Commerce Commission. Barsh Produce Company is a non-licensed trucker. Defendants allegedly conspired together and with said non-licensed trucker to permit "such non-licensed trucker to masquerade as a· common carrier under the guise and protection of the common carrier for hire, permits, rates and licensing of defendant Roy Barsh d/b/a Roy Barsh Truck Company" which practice was in violation of both State and Federal law.

At the time of the accident the truck was carrying an interstate shipment of merchandise for defendant Kerr. The jury returned a substantial verdict for plaintiff. We will assume for the purposes of this opinion that the jury was justified in finding that Hall was guilty of negligence which was a proximate cause of the accident. Hall had vision in only one eye and,

therefore, under the Interstate Commerce Safety regulations was not qualified to drive in interstate commerce.

■ Plaintiff seeks to hold defendants liable under the rule that when a conspiracy exists each of the conspirators is responsible for the acts of any one of said conspirators ·done in furtherance of the conspiracy. In Blasdel v. Gower, 70 Okl. 178, 173 P. 644, the rule is stated in the first paragraph of the syllabus as follows:

"When a conspiracy is shown to have existed for the accomplishment of an object, each of the, conspirators participating in such conspiracy are responsible for the acts of any one of said conspirators done in furtherance of such conspiracy."

See also Powell v. Spence, 169 Okl. 63, 35 P.2d 925.

■■ A conspiracy, as defined in Clark v. Sloan, 169 Okl. 347, 37 P.2d 263, is a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. The gist of a civil action for conspiracy is damages and not the conspiracy.

We will further assume for the purposes of this opinion that there was sufficient evidence tending to establish a conspiracy so as to create a question for the jury on this issue.

Defendants argue that even if a conspiracy was proved they are not liable because there was no causal connection between the· object of the ·conspiracy and the accident. Defendants rely on Bradley v. Chickasha Cotton Oil Co., 184 Okl. 51, 84 P.2d 629. In that case we held that one who unlawfully permitted another to operate a truck under his permit was not liable to a party injured by the negligence· of the truck driver, where the unlawful use of the truck had no causal connection with the injury. The unlawful use of· the truck was said to be a mere condition and not a contributing cause of the injury. However, it is not necessary for us to determine whether that case is controlling in the instant case.. Nor is it necessary to decide

whether non-acting conspirators are liable for the negligent acts of their co-conspirators where the object of the conspiracy did not embrace an intent to cause damage to the person injured. Plaintiff is precluded from recovering in any event for another reason.

■ Plaintiff's predecessor executed a release and covenant not to sue in favor of Hall, the driver of the truck, and Barsh Produce Company, his employer. This instrument contains the customary language of a general release, viz.:

"do remise, release and forever discharge * * * of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, claims and demands whatsoever, * * *."

Then follow provisions to the effect that said release is not intended to release anyone other than those specifically named with express reservations of rights of action against all others.

■ If this were a case involving ordinary joint tort-feasors, each guilty of independent and concurring negligence, it is clear that a release of this type would not release those joint tort-feasors not named. All American Bus Lines v. Saxon, 197 Okl. 395, 172 P.2d 424. In such cases primary consideration is given to the intent of the person executing the release. If, however, the claimed liability of defendants for the negligent acts of Hall and Barsh Produce Co. is derivative in nature, a different rule is applicable.

In Ford Motor Co. v. Tomlinson, 6 Cir., 229 F.2d 873, 877, the court pointed out that under Ohio law an injured person could ordinarily release one joint tort-feasor and later recover from the remaining tort-feasors if the right to do so was expressly reserved in the release. But the court further said:

"* * * in Ohio the release of a tort feasor primarily liable ordinarily operates to release one secondarily liable, *regardless of an attempt to reserve rights against the latter*. Hillyer

v. City of East Cleveland, 1951, 155 Ohio St. 552, 99 N.E.2d 772. See Terry v. Memphis Stone and Gravel Co., 6 Cir., 1955, 222 F.2d 652." (Emphasis supplied.)

In one of the cited cases, Terry v. Memphis Stone & Gravel Co., the court used the following language [222 F.2d 653]:

"Appellant, for a substantial and valuable consideration, signed a covenant not to sue the truck owner, Sullivan, or the truck driver, Hyatt. Inasmuch as the liability alleged against the appellee company rested solely upon the averment that the truck driver was the servant or agent of the appellee company for whose negligence it would be responsible upon the principle of respondeat superior, a covenant not to sue the truck owner and the driver—appellee's alleged agents—would necessarily release appellee. The case is clearly distinguishable from those cases in which a covenant not to sue one joint tort-feasor does not protect another joint tort-feasor from an action for damages brought against it by an injured party."

In Giles v. Smith, 80 Ga.App. 540, 56 S.E.2d 860, 862, the court said:

"Where the liability, if any, of the master to a third person is purely derivative and dependent entirely upon the principle of respondeat superior, and although not technically a joint-tortfeasor, the master may be sued alone or jointly with the servant but a judgment in favor of the servant on the merits (and by analogy, a release of the servant from liability, 35 Am.Jur. 963, 534) will bar an action against the master, where the injury and damage are the same."

We have recognized and applied the rules hereinabove announced. In Mid-Continent Pipeline Company v. Crauthers, Okl., 267 P.2d 568, 571, the plaintiff executed a release and covenant not to sue in favor of defendant's agents for a consideration of $300. Therein, as in the case before us, the

release expressly reserved a right of action against any other persons who might have caused or assisted in causing plaintiff's damage. Subsequently, in the case against the principal, the jury returned a verdict for $600 based upon the defendant's derivative liability for the acts of its agents. We held that the release of the agent released the principal and reversed with directions to enter judgment for defendant. In the body of the opinion we said:

"Under the facts in this case, the only negligence of which the defendant company could possibly be guilty was the negligence of its agents or employees, the Colpitts, whose pumper turned the wrong valve and caused the oil to flow into the watercourse instead of the pipe line. * * *."

"Therefore, the liability of the defendant pipe line company can arise, if at all, only by virtue of the doctrine of respondeat superior."

In the second paragraph of the syllabus it is held:

"Where the master is liable to a third party for the tort of his servant solely by reason of the doctrine of respondeat superior, and no independent or concurring act of negligence by the master is shown, a valid release of the servant from liability for the tort operates to release the master."

In Hammond v. Kansas, O & G. Ry. Co., 109 Okl. 72, 234 P. 731, 732, the defendant railway company leased a portion of its tracks to another railway company. An employee of the lessee railway negligently killed plaintiff's deceased. Plaintiff administrator released the lessee and continued to prosecute its action against defendant lessor. We held that the defendant lessor was at one time liable because it had by its silence and acquiescence led the public to believe that the lessee was authorized to exercise a portion of defendant's franchise, but that the release of the lessee railway company released the defendant from liability. In the body of the opinion we said:

"It is the contention of plaintiff that the two railway companies, the Okmulgee Northern and the Kansas, Oklahoma & Gulf, were joint tort-feasors, and decisions of this court and of the courts of other jurisdictions are cited to the effect that an acknowledgment by the plaintiff of satisfaction against one of two defendants sued as joint tort-feasors will not relieve the other, unless such instrument shows that it was intended to have such effect. Bland v. Lawyer-Cuff Co., 72 Okl. 128, 178 P. 885. The cases cited announce the rule applicable to the facts of those cases, and the decisive question in the instant case, as we view it, is whether the two railway companies were joint tort-feasors. * * *

"It is not contended that the defendant in any way participated in any act or acts of the Okmulgee Northern or its motorman or other employee, which caused or resulted in the injury and there was no concurrent act or acts of negligence on the part of defendant which, in any way, contributed to the injury. * * *

" * * * Assuming that the Okmulgee Northern Railway Company, through its motorman, was negligent, and that such negligence was the primary or proximate cause of the death of plaintiff's intestate, the defendant company would only be secondarily liable on the principle of respondeat superior, or the liability of the principal for the acts of his agent. * * *

" * * * In other words, the doctrine of respondeat superior is applied in such case, and the release of the one who committed the tort inures to the benefit of the principal."

The rationale of this view appears to be that when the agent is released the principal is deprived of his right of reimbursement. The opinion in Losito v. Kruse, 136 Ohio St. 183, 24 N.E.2d 705, 707, 126 A.L. R. 1194, contains the following language:

"A settlement with and release of the servant will exonerate the master. Otherwise, the master would be deprived of his right of reimbursement from the servant, if the claim after settlement with the servant could be enforced against the master."

The court held, however, that a release of and partial satisfaction by the master would not release the servant. This follows because the liability of the servant is primary and not derivative. A release of the master could not operate to his prejudice.

We must now determine whether in the instant case the defendant's liability, if any, is primary or derivative. In 11 Am. Jur. Conspiracy § 54, it is stated in substance that the liability of the non-acting conspirator may be established by invoking the rule of respondeat superior. In Reid v. Holden, 242 N.C. 408, 88 S.E.2d 125, 130, the court said:

"It would seem that, as to a conspirator who committed no overt act resulting in damage, the basis of his liability for the conduct of his co-conspirators bears close resemblance to the basis of liability of a principal under the doctrine of respondeat superior for the torts of his agent."

In that case the court held that a judgment in favor of the acting conspirator was a bar to an action against the non-acting conspirators. This is the law in Oklahoma where a judgment is rendered in favor of an agent and a subsequent action is filed against the principal. It is to be noted, however, that a judgment in favor of a true joint tort-feasor is not a bar to an action against other joint tort-feasors. Lewis v. Ingram, 10 Cir., 57 F.2d 463, certiorari denied 287 U.S. 614, 53 S.Ct. 16, 77 L.Ed. 533. In that case the defendant was sued as a conspirator. The court rejected defendant's claim that a prior judgment in favor of the other alleged conspirators was a bar to the action against him. The expressed basis for so holding was the fact that defendant was guilty of independent tortious conduct so that his liability was not derivative. It is not necessary for us to determine whether the liability of a non-acting conspirator would be primary or derivative in a case where the object of the conspiracy was to cause damage to the person injured. It may be that in such case the non-acting conspirators would be considered guilty of independent negligence as commanding or advising the commission of the tort which caused the injury, and to that extent would be liable as if they had committed the act with their own hands. See Hammond v. Kansas, O. & G. Ry. Co., supra. In the instant case defendants in no way participated in the driver's negligence which injured plaintiff. Nor did they participate in Barsh Produce Company's *alleged* negligence in placing an unqualified driver on the road, and they did not conspire to cause damage to plaintiff or anyone else. If they were ever liable such liability was by reason of their alleged participation in a joint venture, and to that extent their liability for these acts of negligence could not possibly be greater than that of a principal for the negligent acts of its agent or that of a partner for the tortious acts of another partner in which he did not participate, and of which he had no advanced knowledge. The liability in the latter case is also based upon the rules of principal and agent or respondeat superior, and is derivative in nature. See 68 C.J.S. Partnership § 168 and footnotes, and Barrett and Seago Partners and Partnerships, Vol. 1, § 6, pages 459 and 460.

There is no magic in the word "conspiracy" in civil cases. In a civil conspiracy the gist of the action is not the conspiracy but the damages. In most cases where a conspirator has been held liable for acts of his co-conspirators, the object of the conspiracy was to damage the particular plaintiff. If, as contended by plaintiff, there can be liability for injuries caused by the negligence of a co-conspirator and his employee, though it was not the object of the conspiracy to damage anyone, such lia-

bility must necessarily be based upon the rule governing the liability of a principal for the tortious acts of its agent, and is therefore derivative in nature. It therefore follows that the release of those who were guilty of the primary negligence extinguishes the liability of the other conspirators.

■ Plaintiff further contends that the defendant Kerr was guilty of *independent* negligence so that it is liable as a joint tort-feasor without regard to its claimed liability as a conspirator and, therefore, the release and covenant not to sue Hall and Barsh Produce Company could not extinguish Kerr's liability for such independent negligence.

In the discussion which immediately follows, it is necessary to bear in mind that the only problem considered is whether or not Kerr was guilty of independent negligence proximately causing the accident in addition to its claimed participation in the conspiracy. Some of the acts considered might tend to establish that it was a conspirator, but our present inquiry assumes derivative liability as a conspirator and relates to the sole question of whether Kerr was guilty of independent negligence proximately causing the accident which would prevent the release of the acting conspirators from inuring to the benefit of Kerr.

One act of *independent* negligence charged against Kerr is that it permitted Barsh Produce to haul a shipment in interstate commerce knowing that Barsh Produce Company did not have an Interstate Commerce Commission permit. If this was negligence per se *considered independently* of the *conspiracy,* for the reason that it constituted Kerr an aider and abettor in violation of the Federal statutes governing shipments in interstate commerce, such negligence alone had no causal connection with the accident. Bradley v. Chickasha Cotton Oil Co., supra. Plaintiff argues that there was causal connection in that if Barsh Produce Company had been licensed by the Interstate Commerce Commission they could not have employed an unqualified driver. This does not follow. It is true that Hall was not a qualified driver according to the Interstate Commerce Commission's Safety regulations but even if Barsh Produce Company had been licensed they could have, nevertheless, employed an unqualified driver if they so desired.

■ Plaintiff further contends that Kerr was guilty of independent negligence in failing to check the qualifications of the driver. In Marion Machine, Foundry & Supply Co. v. Duncan, 187 Okl. 160, 101 P.2d 813, plaintiff sought to recover from defendant shipper on the grounds that the independent contractor who contracted to haul oil field pipe for defendant was unfit and unskilled in hauling pipe. Answering this contention, we said: .

"Ordinary hauling by truck is neither inherently dangerous nor unlawful. The shipper is under no duty in this state to ascertain whether the motor carrier has complied with the motor vehicle laws or to inquire into the nature and adequacy of his equipment. An automobile is not an inherently dangerous machine."

Plaintiff observes that in the last mentioned case the court suggested that if the shipper had aided or abetted the trucker in his violation of the law it could not contend that the trucker was an independent contractor. Apparently, plaintiff is contending that in such case the trucker would become the servant of the shipper so that the shipper would then have a *duty* to see that the driver was qualified, and therefore Kerr would be guilty of independent negligence in failing to check the qualifications of the driver. It does not appear that this in itself would constitute actionable negligence. See 35 Am.Jur. Master and Servant § 548. Furthermore, in the Marion Machine case the court did not hold that aiding and abetting would destroy the independent contractor relation but merely assumed arguendo that such contention was correct. In making this assumption the court was mistakenly influenced by certain

language used in Bradley v. Chickasha Cotton Oil Co., supra. In that case the defendant knowingly permitted a contractor to use its permit in violation of the law. The court said this might constitute part of the proof of a master and servant relationship *if* there was other evidence tending to show such relationship. In discussing this question, the court further said [184 Okl. 51, 84 P.2d 633]:

"\* \* \* A relationship is never adjudged to be that of master and servant unless the master is shown to have had, at least in theory, some control over the acts of the alleged servant which caused the injury. Whatever is said concerning the payment of mileage tax and use of the permit, the undisputed evidence in the present case showed a total absence of this necessary element."

Likewise, in the instant case, there is a total lack of evidence tending to show any independent control by Kerr over Barsh Produce Company or its driver.

▇ Finally, plaintiff contends that if the release and covenant not to sue released defendants such instrument was void and of no effect. The order of the County Court authorizing the administrator to execute the release and covenant not to sue further directed the administrator:

"\* \* \* to proceed in such manner as may be *deemed* in the best interest of said estate to press, prosecute, institute actions, or otherwise proceed as by law provided, in Order to recover *just* claims, damages, debts and losses to said estate from all persons whomsoever, excepting only those above named with whom said Administrator is herein directed to enter into a Covenant Not to Sue." (Emphasis supplied.)

Plaintiff contends that if, under applicable law, the plaintiff did not have a cause of action against the defendants that portion of the order above quoted is void; therefore, that part of the order which orders the execution of the release and covenant to sue was also void. This contention is without merit for numerous reasons.

The County Court had jurisdiction to authorize the execution of the release and covenant not to sue; therefore, even if that part of the order directing further suits were void, it would not follow that the balance of the order was void.

Furthermore, that part of the order directing the institution of such action as "may be deemed in the best interest of said estate \* \* \* to recover just claims" is not void. Pursuant to his order the administrator *did* proceed to institute an action which he deemed to be in the best interests of the estate. We have held that there was no "just" claim against these defendants because they were not guilty of independent negligence proximately causing the accident. This does not mean plaintiff had no right to *institute* the action. The trial court erred in overruling defendant's motion for a directed verdict.

The judgment is reversed and the cause remanded, with instructions to set aside the judgment and to render judgment for defendants, Kerr Glass Manufacturing Company and Roy Barsh d/b/a Roy Barsh Truck Lines.

DAVISON, HALLEY, JOHNSON, WILLIAMS and CARLILE, JJ., concur.

WELCH, C. J., concurs in result.

BLACKBIRD and WILLIAMS, JJ., dissent.

BLACKBIRD, Justice (dissenting).

I cannot agree with the majority opinion. As I read it, it mentions two considerations which may militate against upholding the verdict and judgment against Roy Barsh, d/b/a Barsh Truck Line and Kerr Glass Manufacturing Corporation. I use the words "considerations" instead of "reasons", and "may" instead of "do", because one of them is mentioned only inferentially, or abstractly, in discussing the case of Bradley v. Chickasha Cotton Oil Co., 184

Okl. 51, 84 P.2d 629, in the following words:

"The unlawful use of the truck was said to be a mere condition and not a contributing cause of the injury."

Then immediately follows this statement:

"However, it is not necessary for us to determine whether that case is controlling in the instant case."

Then, at the end of the same paragraph, the opinion states:

"Plaintiff is precluded from recovering in any event for *another reason*." (Emphasis mine.)

Then it follows with a discussion of the "release", and its conclusions in regard thereto obviously control the therein announced decision reversing the judgment appealed from.

Of course, a determination adverse to the plaintiff on either of such phases of the case would be sufficient in itself for reversal—if either determination was tenable—but, in my opinion, neither could be. Here the recovery the jury awarded plaintiff was based on its determination that the Melvin Fisher Estate's damages arose out of the violation of the federal act plaintiff pleaded and proved, called "The Interstate Commerce Act" in reference to "Motor Carriers" (Part II, 49 U.S.C.A. § 301 et seq.). Said Act provides that, except as therein provided "no common carrier by motor vehicle" subject to its provisions "shall engage in any interstate * * * operation on any public highway * * * unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: * * *" (49 U.S.C.A. § 306(1)); and anyone knowingly and wilfully violating any of its provisions, "or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided," is guilty of an offense against the United States and may be proceeded against in "the district court of the United States for any district where such motor carrier or broker operates * * *". 49 U.S.C.A. § 332(a, b). The Act specifically provides that "any person, whether carrier, shipper, consignee, or broker, or any officer, employee, agent, or representative thereof" who, by the means of "any false statement or representation, or by the use of any false or fictitious bill, bill of lading, receipt, voucher, * * * deposition, lease, or bill of sale, or *by any other means or device* * * * shall knowingly and willfully, by any such means or otherwise fraudulently seek to evade or defeat regulation as in this chapter provided for motor carriers or brokers, shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not more than $500 for the first offense and not more than $2000 for any subsequent offense." 49 U.S.C.A. § 322(c). In view of the foregoing, regardless of what this court has held in Bradley v. Chickasha Cotton Oil Co., supra, or any other case involving a violation of one of our State's statutes, the federal rule must be applied here. Under that rule, where the Interstate Commerce Commission has granted a person or firm a license or franchise to operate trucks interstate, as a common carrier, "the duty of safeguarding the public while performing such franchise is legally non-delegable and the franchise holder is therefore responsible for the conduct of those whom it permits to act under its franchise, *even though such persons be independent contractors*." (Emphasis mine.) Hodges v. Johnson, D.C.W.D., Va., 52 F.Supp. 488, 491. Applying this rule to the present case, Roy Barsh, d/b/a Roy Barsh Truck Line, to whom the Interstate Commerce Commission issued the permit, under which John and Obie Barsh, d/b/a Barsh Produce Company were operating the death-dealing truck at the time of the accident, is equally liable with the latter for injuries due to the *concededly* negligent operation of the truck, and, if said Truck Line's legal responsibility for the conduct of John and Obie Barsh, d/b/a Barsh Produce Company, along with the latter's truck driver, Thomas Hall, whom it permitted to act under its franchise,

*was a primary,* as distinguished from a secondary, one (without any relationship of master and servant between the Produce Company and the truck line to furnish a conduit for vicarious, or derivative, liability) then the majority opinion is wrong.

The majority denies plaintiff the compensation that the jury and trial court awarded him for the death and other injuries involved herein. They have accomplished this by the process of holding that when J. F. Brown, plaintiff's predecessor Administrator of the Melvin Fisher Estate, executed and delivered to parties, other than the defendants, an instrument, entitled "Release And Covenant Not To Sue", for a recited consideration of $2,500, he, in effect precluded the estate from collecting the remainder of its damages against the defendants *even though the parties thereto never intended any such thing.* Though the majority opinion abrogates the intention of the party executing the instrument, since it recognizes that, if defendants' liability was joint and several, as in the case of tort feasors, "a release of this type would not release them", it is unnecessary, for the purpose of this opinion, to belabor that point. In this connection, see Boucher v. Thomsen, 328 Mich. 312, 43 N.W.2d 866, 20 A.L.R.2d 1038, and the annotations thereto. (However, it may not be amiss to show that there is concrete foundation for this recognition in language of the instrument other than that quoted in the majority opinion and referred to there as "the customary language of a general release." This language is as follows:

"It is understood and agreed that this settlement is a compromise of a doubtful and disputed claim and that the payment made is *not to be construed as an admission of any liability* on the part of the party or parties hereby released, and *that liability is expressly denied and said settlement is made as a compromise and to avoid litigation and to buy their peace.*

\*   \*   \*   \*   \*   \*

"\* \* \*· the consideration for this covenant not to sue representing and being *only a partial consideration for the total loss and damage* sustained by the said Melvin Fisher, Deceased.

"In executing this instrument J. F. Brown, Administrator of the Estate of Melvin Fisher, Deceased, hereby declares his present purpose and intent to assert claims and, if needs be, institute actions against persons, firms and corporations other than \* \* \* John Barsh and Obie Barsh, co-partners d/b/a Barsh Produce Company, and Thomas Hall, to recover the *balance* remaining of the *loss and damage* sustained by the said Melvin Fisher, Deceased." (Emphasis mine.)

The majority opinion theorizes that it was solely the acts of defendants' co-conspirators, John and Obie Barsh, d/b/a Barsh Produce Company, and the truck driver Thomas Hall (beneficiaries of the above agreement) that caused plaintiff's injuries; that defendants' liability was merely secondary and derived through their relationship with those parties primarily liable (as that of a master for the acts of his servant); and therefore that the Fisher Estate's release of Hall and Barsh Produce Company (involving only a part of its damages) was, in legal effect, a *total* release of all its damages, and precludes it from recovering any additional damages whatsoever against the defendants, simply because their liability is only "derivative." None of the cases cited by the majority is authority for such a holding. Of these, the only case which has anything to do with a conspiracy is the North Carolina case of Reid v. Holden, 242 N.C. 408, 88 S.E.2d 125, 130, from which the majority quotes the following:

"It *would seem* that, as to a conspirator who committed no overt act resulting in damage, the basis of his liability for the conduct of his co-conspirators *bears close resemblance* to the basis of liability of a principal under the doctrine of respondeat superior for the tort of his agent." (Emphasis mine.)

An examination of the opinion in this North Carolina case readily reveals that the

quoted part is purely dictum and without any cited authority. This court should not use as a basis for overruling the verdict and judgment entered in the trial court, and thus depriving plaintiff of what I consider a just recoupment of loss, the speculation of some other court as to what is the reason, or rationale, behind a conspirator's being liable for the acts of his co-conspirators, or its surmise as to what other form of liability, his liability, in theory, bears a resemblance, or, by analogy, may resemble the most. *The fact remains in this jurisdiction, and over the nation generally, that in a conspiracy, each conspirator is jointly and severally liable for all damages resulting from the conspiracy.* See Lewis v. Ingram, C.C.A.Okl., 57 F. 463, certiorari denied 53 S.Ct. 16, 287 U.S. 614, 77 L.Ed. 533. In 11 Am.Jur., "Conspiracy", sec. 48, it is stated:

"The connection between the parties having been established, whatever was done in pursuance of the conspiracy by *one of the* conspirators is considered as *the act of all the conspirators;* all are *equally* liable therefor as joint tortfeasors, regardless of whether they were original parties to the conspiracy and *irrespective of either the fact they did not actively participate therein or the extent to which they benefited thereby.*

\* \* \* \* \* \*

"Every person entering into a conspiracy already formed is *deemed* in law *a party to all acts committed by any* of the other parties either before or after his entrance, in furtherance of the common design." (Emphasis mine).

The majority says:

"In 11 Am.Jur. Conspiracy, § 54, it is stated in substance that the liability of the non-acting conspirator may be established by invoking the rule of respondeat superior."

The exact wording of the cited statement is:

"In a suit for civil damages caused by conspiracy, the plaintiff, *in order to connect any persons with the tort,* may invoke either the rule of respondeat superior *or* the rule which makes each co-conspirator the agent and spokesman of all in the unlawful enterprise." (Emphasis mine.)

That this statement merely pertains to evidence and the manner of proving a conspiracy is obvious from reading the case of Schultz v. Frankfort Marine Accident & Plate Glass Ins. Co., 151 Wis. 537, 139 N.W. 386, 390, 43 L.R.A.,N.S., 520, cited in the Text's footnote as sole authority for it. As will hereinafter be revealed, no such aid to proof was needed in the present case to connect Kerr Glass Manufacturing Company, through its Traffic Manager, Atkins, with the unlawful operation of the death-dealing truck in the present case. Atkins' own testimony does this. Furthermore, the cited case seems to lend support, at least inferentially, to the proposition that one conspirator is responsible for the acts of his co-conspirators (after he is connected with, or proved to be a part of, the conspiracy) independently, and apart from any idea, of agency or respondeat superior. The conspiracy involved in the cited case was alleged to be for the purpose of annoying, harassing and intimidating the plaintiff Schultz, in order to get him to leave the city of Milwaukee, and refrain from testifying in a certain law suit in the event a new trial should be granted therein. Recovery was sought against an employer's liability insurance company, its resident agent, Bacher, a Mr. Gordon, manager of a private detective agency, and one Paczkowski, one of the same agency's detective-employees. The specific acts which annoyed, harassed and intimidated the plaintiff were largely committed, or performed, by Paczkowski and another of the detective agency's employees named Heyer, who was not made a defendant in the action. There, in reversing the judgment of the trial court, after said court had directed a verdict for the defendants, the Wisconsin Supreme Court said:

"It is argued that neither the detective agency nor Heyer are made parties defendant; hence that the plaintiff has not the right to complain of unlawful actions on the part of Heyer. But the liability of conspirators to civil damages is joint and several, and, a conspiracy being shown prima facie, the plaintiff may give in evidence the acts and sayings of any conspirator done or said in furtherance of the common purpose, whether that conspirator be a party defendant or not. (Citing authority). It is argued that the defendant Gordon was not master of Paczkowski or Heyer but was, like them, an employé of the detective agency, and that the insurance company and Bacher were not responsible for excess of zeal or excess of authority on the part of Heyer or Paczkowski. This is also an erroneous view of the law. When persons are charged as conspirators, and a prima facie case of conspiracy is shown, the acts and sayings of each conspirator whether a defendant or not, in furtherance of the unlawful conspiracy *is evidence* against his co-conspirator *not* under the rule *respondeat superior,* but under that rule of the conspiracy law which makes each the agent and spokesman of all in the unlawful enterprise. The plaintiff in a suit for civil damages caused by conspiracy may invoke, *for the purpose of connecting any person with the tort, either* the rule *respondeat superior or* the rule above stated relative to the acts and admissions of conspirators, and this is so elementary as not to require the citation of authority in its support. In this case there is evidence tending to hold the defendants Gordon and Bacher under *the conspiracy rule,* and the defendant insurance company under this same rule as well as under the rule *respondeat superior.* (Citing authority)." (Most emphasis mine.)

From the above, it may be deduced, that the liability of the members of a conspiracy for the acts of any one of them is something different from, and under the true "conspiracy rule", is wholly separate and independent of, "respondeat superior" liability. In 15 C.J.S. Conspiracy § 18, it is said:

"Each conspirator is jointly and severally liable for all damages resulting from the conspiracy. Accordingly, the rule * * * is well settled that where two or more persons enter into a conspiracy, *any act done by either* in furtherance of the common design and in accordance with the general plan becomes the act of all, and *each conspirator is responsible for such act.* This is true even though the results were not specifically intended or the means specifically agreed on * * *". (Emphasis mine.)

To me the rule that co-conspirators are "equally" liable as joint tort feasors means exactly what it says, i. e., that each is liable in the same, identical way, and to the same extent and degree, as every other. It does not mean that some are primarily liable and others are only secondarily, or derivatively, liable. If all are on the same level, or in equal status, as to liability, and the act of one is, for all intents and purposes, the act of every other member of the conspiracy, and their liability therefor is several, as well as joint, then I can see no reason why the total liability cannot be adjusted in a severable manner, and part of the damages paid by some, and the rest recovered from others, just as was intended to be done—and was done—in this case. In this connection, see 45 Am.Jur., "Release", sec. 36. Though Losito v. Kruse, 136 Ohio St. 183, 24 N.E.2d 705, 707, 126 A.L.R. 1194, cited in the majority, was a *master-servant* negligence case, instead of a *conspiracy case,* and is therefore no authority for the majority's theory (contrary to any authority I have seen) that the liability of co-conspirators is derivative, the opinion in that case quotes from another case, the following:

"It is an old rule of law that any party charged with a liability, however

informally, or threatened with a suit at law, may buy his peace, may settle his own controversy, without waiting for a suit at law or the trial of a suit already begun, and that any such settlement made in good faith would be fully protected and operates as a release to the parties affected, *according to its terms.*" (Emphasis mine).

The trial court recognized the above principle when it told the jury in its Instruction No. 17, that if it found for the plaintiff, it should, after determining the total amount of damages to which he was entitled, deduct therefrom, the $2,500 paid as the consideration for the release delivered to Hall and others (as aforesaid); and we must presume that the jury followed this direction, accepting said settlement as a satisfaction of plaintiff's claim "pro tanto", or—to that extent. Yet, a verdict and judgment in the sum of $76,000 is vacated by the majority opinion without mentioning this:

While it is true that in Lewis v. Ingram, supra, it was pointed out that the defendant was charged as a conspirator and that his liability was personal, rather than vicarious, the court attempted no distinction between the liability of (what the majority terms) "non-acting" conspirators and "acting" conspirators. The opinion in that case referred to, and treated, *all* conspirators as "joint tort-feasors."

Even if the majority's apparent theory that the defendants were "non-acting" conspirators, with "derivative" liability only, was tenable, it would not be applicable to this case. I find ample evidence in the record to support a conclusion by the jury that they were both members of the conspiracy, and actively participated in a general scheme to operate motor trucks in violation of the Interstate Commerce Act, *supra.* If they did, it is immaterial that they, or any of their employees, agents or officers through whom they acted, may not have intended, or have foreseen, that by so doing, death or injury to Melvin Fisher, or any member of his family, or to his estate would have resulted.

In plaintiff's petition he alleged in substance that defendants, together with John and Obie Barsh, d/b/a Barsh Produce Company entered into a conspiracy to violate the Interstate Commerce Act by shipping merchandise in interstate commerce, as a common carrier, in trucks owned and operated by Barsh Produce Company, which has no I. C. C. permit to so operate; and that a certain one was driven by Hall, who could not pass the physicial examination required of drivers for holders of I. C. C. permits; and that, in the course of carrying out this unlawful conspiracy, said truck had the accident out of which arose the injuries for which damages in the total sum of $200,900 was sought.

As will be noted from the majority opinion, it recognizes the existence of the conspiracy and that the driving of the truck by Hall, a physically incapacitated driver under I. C. C. regulations, was the proximate cause of the accident. That opinion erroneously assumes, however, that even though the defendants may have been members of the conspiracy, they were "non-acting" members. *The Majority has confused the meaning of its term "non-acting."* Apparently they construe the term to refer to the accident, rather than to the formation, or furtherance, of the conspiracy; and regard the defendants as "non-acting" conspirators, on the theory that they were guilty of no independent *negligence causing the accident.* To quote the majority opinion:

"In the discussion which immediately follows, it is necessary to bear in mind that the only problem considered is whether or not Kerr was guilty of independent *negligence* proximately causing the accident *in addition to its claimed participation in the conspiracy.* Some of the acts considered might tend to establish that it was a conspirator, but our present inquiry assumes derivative liability as a conspirator and relates to the sole question of whether Kerr was guilty of independent *negligence proximately causing the accident* which would pre-

vent the release of the acting conspirators from inuring to the benefit of Kerr." (Emphasis mine.)

In my opinion, the above is expressive of an involved theory. It misapprehends the true basis of liability in a conspiracy case and forgets that once a person, or entity, is a party to a conspiracy, or common design, either to accomplish an unlawful thing or to do a lawful thing by unlawful means, he is responsible for the acts of anyone of his co-conspirators done in furtherance of that scheme, whether he intended, or foresaw, such acts or not. Therefore, if the evidence established that the defendants were parties to a conspiracy to violate the Interstate Commerce Act by operating, as a common carrier, in interstate commerce, without an I. C. C. permit, it is immaterial that defendants did nothing contributing to the accident which Hall had, in driving the truck to carry out the purposes of said conspiracy. It is immaterial to their liability, that the defendants, Roy Barsh or Kerr Glass Manufacturing Company may not have dictated the way that this unlawful conspiracy was carried out, or that they may not have had anything to do with the selection of Hall as the driver of the truck which did the hauling—*though there is evidence that they actively participated in both*.

Roy Barsh testified that, in 1946, he moved from Tulsa, Oklahoma, to Joplin, Missouri, where he is now engaged in the trucking business as Roy Barsh Truck Line, operating twenty-five trucks, and in the banana business as the Joplin Banana House; that previous to that time he was engaged in business in Tulsa, where his brother John worked for him as a truck driver "off and on for four or five years, maybe more"; that his truck that John was then driving for him was one licensed to operate in interstate commerce and that, besides the witness' own produce, it hauled glass for the defendant, Kerr Manufacturing Company of Sand Springs, "starting possibly in '36 or '37"; that during that time in Tulsa, his office was in a little building at "27 North Trenton" which he owns, and he also had a basement under a house at "25 North Trenton"; that in 1946, right after the witness left Tulsa, the little building at 27 North Trenton was made into an insulated room for ripening bananas; that there are two telephones at 25 North Trenton; that his brothers, John and Obie Barsh, are a partnership under the firm name of Barsh Produce Company, and on April 6, 1952, (the date of the accident) and now, they own four trucks and rent his building for their business; that, when he moved to Joplin, he made arrangements with Kerr to leave his pad and book of freight bills and lease agreements with said company's Mr. Atkins, with the understanding that when Kerr had a load of bottles it wanted hauled, Atkins would call him collect and he would send a truck down; that between 1946 and 1952, Mr. Atkins called the witness on a number of occasions for hauling; that during all the years he has hauled for Kerr Glass Manufacturing Company, he has transacted such business with Mr. Atkins, a friend, whom he has known "20 odd years"; that his brother, John, has also known Atkins for years; that when the witness has a need for one of Barsh Produce's trucks he "gives them a ring on the telephone and asks if they have a piece of equipment I could lease"; that, in connection with the haulage of glass from the Kerr Glass Company in the name of Roy Barsh Truck Line, the witness signed in blank, "a bunch" of truck lease forms and left them with Atkins. The witness identified certain exhibits that were freight bills made out in the name of "Roy Barsh Truck Line" and signed by Mr. Atkins, evidencing shipments in interstate commerce of glass jars from Kerr Glass Manufacturing Company in March, 1952, as well as exhibits that were letters addressed to "*Johnny* Barsh Truck Line" and Johnny Barsh, 27 North Trenton, Tulsa, Oklahoma, from Kerr Glass *signed by Atkins,* as Kerr's traffic manager, inclosing checks in payment for hauling, which letters indicated that carbon copies of them went to *Roy* Barsh Truck Line in Joplin, Missouri.

The witness denied that he had arrangements with Kerr Glass, through Atkins, its traffic manager, to take care of routing and making arrangements for the procuring of drivers and trucks for such haulage, when Roy Barsh trucks were not in Tulsa; but other testimony of the witness was as follows:

"Q. * * * If the Barsh Produce Company hauls a load and the check is mailed to you, made payable to your order, either individually as Roy Barsh or Roy Barsh Truck Line, what becomes of that money, what do you do with it?

"A. If there is a check made payable for a load of glassware that we lease their (Barsh Produce Co.) trucks for, I hold out the three percent for the Federal tax and mail the check to Barsh Produce, Tulsa, Oklahoma."

The witness further testified that he had known the truck driver, Tom Hall, for years and that Hall worked for him some during World War II; that he knew Hall was a one-eyed man and had a forefinger cut off at the first knuckle, but denied that, when he knew him, "it drew up under his hand." When asked if he ever gave instructions to Kerr Glass' Mr. Atkins in regard to calling at "25" or "27 North Trenton", in Tulsa, to get trucks, the witness testified:

"If, Mr. Atkins would call me for a truck and I didn't have one, as a rule, why, I would call Johnny or Obie (Barsh), either one of them, and ask them if they had a truck available they wanted to spot lease. And occasionally Mr. Atkins might call over with my consent. It wasn't over all the time, * * *—every deal was a different arrangement."

Other excerpts from the testimony of this witness are as follows:

"Q. * * * Now, as I understand it, Mr. Atkins was supposed to call you at your office in Joplin when he had a load, is that correct? A. That's right; call me collect.

*    *    *    *    *    *

"Q. Well, when was it he could call out to 27 North Trenton Street in Tulsa? A. After he had called me.

"Q. What was the reason for him calling out thereafter he called you?

*    *    *    *    *    *

"A. To check with my brothers to see if they had a truck we could lease.

*    *    *    *    *    *

"Q. If your brother would send Mr. Hall that would be satisfactory with you, wouldn't it? A. No, sir.

"Q. Would you limit it to any particular driver? A. Yes, sir.

"Q. Who would you limit it to? A. * * *; if he would find a truck operator he would call and I would have to pass on the driver and the owner.

*    *    *    *    *    *

"Q. If he would call my office and I would talk to him and he needed a truck I usually had one, but occasionally I would be out of trucks and I would check with my brothers, Johnny and Obie, to see if they had one.

"Q. Who checked with them? A. I checked at times and maybe Mr. Atkins would at times.

"Q. He had authority to check with them? A. He could call if he wanted to.

*    *    *    *    *    *

"Q. You would expect Mr. Atkins to call you back and tell you your brother was willing to lease you a truck and furnish a driver? A. That's right.

Roy Barsh further testified that in 1952 he had a listing in the Tulsa telephone directory as "Roy Barsh Produce Company", and that he left it there for the benefit of his brothers; that when he moved to Joplin, his brothers moved into what he had occupied at Tulsa.

Atkins testified that, as part of his duties as traffic manager for Kerr, *he selected*

*truck operators for the hauling of its merchandise*; that he had known John Barsh fifteen years, but doesn't know what business he is in now, or was, on April 6, 1952, engaged in. He further testified that he had known Roy Barsh twenty years; and that it is within the scope of his employment to engage the kind of equipment needed for Kerr shipments. He first denied that Kerr had done any business with Barsh Produce, or ever made any payments to it for freight haulage. Then he testified as follows:

"Q. Now in the handling of your business, please, sir, we will say you want a load moved by the Roy Barsh Truck Line, what do you do? A. I instruct our switchboard operator to put in a long distance call for Mr. Roy Barsh at Joplin, Missouri.

"Q. Now suppose that it developes he doesn't have a truck available, what do you do then? A. When I talk to Mr. Barsh I tell him what we need, a certain piece of equipment to take a truck load of bottles or jars, for example say to Houston, Texas, and that is all I tell him. It is up to him. I leave it up to him then to handle it, to furnish the equipment.

"Q. Now, suppose then that he sends a truck out there or that a truck appears at your place to load this that does not belong to Roy Barsh, the Roy Barsh Truck Line, what do you do then? A. Unless he tells me that it is some other truck than his own I don't do anything about it.

*       *       *       *       *       *

"Q. Does it occur on occasions that trucks appear for this load other than trucks owned by Roy Barsh Truck Line? A. There have been cases.

"Q. * * * when the vehicle arrives, if it isn't a Roy Barsh vehicle what do you do? A. Well, the understanding is—

*       *       *       *       *       *

"A. Well, in talking to Mr. Roy Barsh previously. * * *

*       *       *       *       *       *  .

"A. If Mr. Barsh doesn't furnish his own equipment then he tells me that he will furnish equipment, leased equipment, and when he does that *he is supposed to instruct the lessor of the equipment when they arrive at Sand Springs at our warehouse dock to come upstairs to my desk in the office on the second floor and bring their registration papers for the tractor and trailer so I can proceed to execute the lease for Mr. Roy Barsh.*

*       *       *       *       *       *

"Q. * * * Now, Mr. Atkins, that is the truck driver that is supposed to come up and see you?

*       *       *       *       *       *

"A. I guess you would say it that way.

"Q. When he gets up there to see you, you fill out the papers? A. Yes.

"Q. What papers are filled out in the way of a lease—we are talking about now? A. A little lease form.

"Q. That lease is between whom? A. Whoever the lessor is, the name of the lessor and the Roy Barsh Truck Line.

*       *       *       *       *       *

"A. Are you talking about today? .

"Q. No; I am talking about back in April 1952.

*       *       *       *       *       *

"A. At that time the lease was signed Roy Barsh Truck Line *per J. A. Atkins.*

*       *       *       *       *       *

"Q. *In other words, you executed the instrument as the agent of Roy Barsh?* A. *Yes, sir.*

"Q. Now, that practice had been continuing over what period of time, please, sir?

*       *       *       *       *       *

"A. Two or three years, something like that.

"Q. Now, when the truck driver appears with his vehicle and ready to

load do you make any inspection of the vehicle as to whether or not it carries the ICC numbers or as to the medical examination of the driver?

*   *   *   *   *   *

"A. No.

"Q. If you know, does any other person for the Kerr Glass Manufacturing Corporation make such inspection?

*   *   *   *   *   *

"A. *No one but myself would have any authority to do that.*

*   *   *   *   *   *

"Q. I ask you, please, sir, whether or not the Roy Barsh Truck Line have a station, depot, office, or any type of office in Tulsa, Oklahoma?

*   *   *   *   *   . *

"A. Mr. Roy Barsh told me when he moved his home office to Joplin that he would have an office in Tulsa.

*   *   *   *   *   *

"Q. Do you transact any business with that office? A. I do, but only when I first call Mr. Roy Barsh at Joplin and then if I can't get him I call his Tulsa office and if he is not there sometimes his brother Johnny Barsh answers the phone and then I tell Johnny to try to locate Roy and tell him that we need a certain piece of equipment to haul a load of jars to Houston, for example.

*   *   *   *   *   *

"A. *   *   * Johnny Barsh * * is the Tulsa agent for the Roy Barsh Truck Line.

*   *   *   *   *   *

"Q. Now, you sign those leases, don't you, Mr. Atkins? A. I sign it as agent for the Roy Barsh Truck Line.

*   *   *   *   *   *

"Q. Where does it say 'agent' on one of them? A. I am telling you that now. It was just a verbal agreement that Mr. Barsh said I could go ahead and sign those lease forms with my name and in the manner that they were all handled that way.

*   *   *   *   *   *

"Q. Now, when you fill out a lease you know at that time that it is going to haul Kerr Glass Company merchandise, don't you, Mr. Atkins?

*   *   *   *   *   *

"Q. Now, do you make any check at that time as to the driver and equipment when he presents himself?

*   *   *   *   *   *

"A. No, I don't make any check.

*   *   *   *   *   *

"Q. Now, when it comes to paying for this service, Mr. Atkins, who figures what percent of the total freight bill is payable or receivable by Roy Barsh and what part of it goes to the leased-truck owner?

*   *   *   *   *   *

"The Court: Are you talking about the Roy Barsh transaction?

"Mr. Rainey: I am talking about Roy Barsh on the 6th day of April, 1952 and previous thereto.

*   *   *   *   *   *

"A. Mr. Barsh told me that he would accept 15 percent of the revenue as his part for the handling of the papers. In other words, 85% then would go to the lessor.

"Q. And I will ask you, please, sir, if it was not your practice and custom in transmitting the copy of the lease letter, after the freight moved out, to Roy Barsh in Joplin or in Tulsa, as the case might have been, to figure that out and do that figuring and show the amounts that went to the owner and the Roy Barsh Truck Line.

*   *   *   *   *   *

"A. I am the only one that executed the lease so I would have to be the only one that would figure it.

*   *   *   *   *   *

"Q. * * * Mr. Atkins * * * to refresh your memory I will ask you if you haven't previously testified that he (John Barsh) held no Certificate of Convenience and Necessity? A. That

is probably what I said, but to actually know I would have to write to the Interstate Commerce Commission in Washington, and ask them if they have got such a document on file there.

"Q. To get it on the basis of common knowledge, he isn't recognized as an interstate carrier, is he? A. I don't know. *At least we have never recognized him as a common carrier—I mean the Kerr Glass Manufacturing Corporation.*

"Q. * * * where does those lease forms come from? A. We have been mimeographing those forms and making them in our own office.

"Q. * * * where do those (freight bills) come from? A. The freight bills are also furnished by Mr. Barsh.

"Q. Do you have a pad of them there, of each of them, there at your office? A. Yes, sir.

"Q. * * * You didn't go out and look to see if Mr. Roy Barsh had his name on the side or the ICC insignia? A. You mean on this particular shipment?

\*　\*　\*　\*　\*　\*

"A. No; not necessary for me to go down to the dock.

"Q. It is necessary, isn't it, or should have some concern about the kind of trucks that haul your merchandise down the highway, shouldn't you?

\*　\*　\*　\*　\*　\*

"A. No, I never make any effort to go down and check the equipment to find out what condition it is in or anything else; I just don't do that.

\*　\*　\*　\*　\*　\*

"Q. You were interested in this transportation just the same as the two Barsh boys were, weren't you? A. Certainly.

\*　\*　\*　\*　\*　\*

"Q. Now, I will ask you if when your deposition was taken shortly after this accident in 1952 this question was asked and answer given—

\*　\*　\*　\*　\*　\*

"You gave this answer, 'Well, the only thing that I know in that particular respect is, that whenever we need equipment to handle a truck load of our glassware, *I call Mr. John Barsh here in Tulsa* and he is the one that usually arranges to furnish us with the equipment.'

"Q. Did you give that answer, please sir? A. I did.

\*　\*　\*　\*　\*　\*

"Q. * * * I will ask you, please, sir, if when you testified in this case under oath on the 12th of September, 1952, if these questions were asked you and these answers given. * * *

\*　\*　\*　\*　\*　\*

"Question, 'Do you personally know him (Thomas Hall) at all?'

"Answer, 'I have met him a time or two.'

"Question, 'He had hauled, then, I take it, on previous occasions to this occasion? That is the 6th day of April, 1952?'

"Answer, 'Yes, sir'." (Emphasis mine.)

It would be impractical to quote, or describe, all of the evidence in the record consisting of more than one thousand pages, including the writings and documents, some of which I think bear mute witness (more reliably and convincingly than the testimony of the above-quoted biased and hostile witnesses connected with the defendants) of the existence of the conspiracy alleged in plaintiff's petition. It should be mentioned, however, that, in addition to the facts shown in the above-quoted testimony, there was reliable evidence that one or more of the conspirators had placed, and maintained, in the Tulsa telephone directory, a listing of a non-existent firm under the fictitious name of "Roy Barsh Produce Company." This name being similar to that of the existing Tulsa firm of "Barsh Produce

Company" (composed of John and Obie Barsh) yet containing in it the name of the I .C. C. permit holder, Roy Barsh, was an aid to the conspiracy in operating the Tulsa business after the permit holder's removal from this State to Missouri, and was easily misleading and tended to give the operation of trucks, belonging, in reality, to John and Obie Barsh, or Barsh Produce Company, a cloak of legitimacy in operating under a permit issued only to Roy Barsh, d/b/a Roy Barsh Truck Line.

In relation to Atkins and his ostensibly sole employment with Kerr Glass Manufacturing Company, the evidence presents the sorry, and indeed unique, spectacle of a man (Atkins) serving (in addition to himself, if he conceivably derived any benefit from it) three masters in the course of his employment by one, Kerr Glass Manufacturing Company. It will be recalled, according to his above-quoted testimony, it was within the course of his employment as traffic manager of Kerr Glass Company to select operators to haul said Company's merchandise and to engage the kind of equipment needed therefor; and it may reasonably be inferred from the hereinbefore quoted testimony that this authority (at least as he exercised it under his arrangement with the Barsh Brothers) extended to selecting, or passing upon, the particular driver who would operate the truck and who must report to his office with the registration papers for the tractor and trailer so that he "can proceed to execute the lease for Mr. Roy Barsh." From the evidence, the jury may quite logically and reasonably have arrived at the conclusion that this procedure was followed in the instance of Kerr's engagement of the truck, causing the death involved herein; and that Atkins approved Hall, as the driver thereof, even though he knew, or should have known, he was physically incapacitated and could not pass the physical examination required for drivers working under I. C. C. permits.

Even if plaintiff's case against Kerr Manufacturing Company would fail in the absence of any negligence on the part of that company (which seems to be essential to the majority's theory) I think the evidence I have pointed out shows the following statement in the majority opinion to be of questionable accuracy:

"Nor did they (defendants) participate in Barsh Produce Company's alleged negligence in placing an unqualified driver on the road, * * *".

The majority opinion also says:

"Likewise, in the instant case, there is a total lack of evidence tending to show any *independent* control by Kerr over Barsh Produce Company or its driver." (Emphasis mine.)

It is not my understanding of the law that in a conspiracy case, it is necessary, in order to hold a defendant liable as a conspirator for the act of a co-conspirator in furtherance of the conspiracy, to show that he had some type of control outside, or independent of, the conspiracy over the co-conspirator who committed the act. It has always been my opinion (and the authorities bear me out) that control arising out of, and exercised in furtherance of the conspiracy, is enough; and that is the situation here. By reason of Roy Barsh's arrangement with Atkins and his brothers, John and Obie Barsh, to enable Roy Barsh to retain Kerr Glass Manufacturing Company's hauling business, even after he left this State and moved to Joplin, Atkins was given authority as an agent of Roy Barsh Truck Line to lease unlicensed trucks with drivers that would operate under said Truck Line's I. C. C. permit. If such unlawful schemes, or combinations, were allowed to flourish and grow, they would not only result in unfair competition with domestic haulers possessing I. C. C. permits, but it would only be a question of time until I. C. C. regulations, and the protection of the public on highways therefrom, would be an empty mockery.

The fact that Kerr Glass Manufacturing Company may have known of the formation and operation of the unlawful conspiracy only through its Traffic Manager, Atkins, is no impediment to its liability. The

only way that a corporation or partnership may know, or do, anything is through its officers, agents, or employees. The limitations upon the imputation to his principal, of an agent's knowledge referred to in Aetna Casualty & Surety Co. v. Local Bldg. & Loan Ass'n, 162 Okl. 141, 19 P.2d 612, 613, 86 A.L.R. 526, do not apply to the facts of this case. As Kerr Glass Manufacturing Company accepted the benefit of the arrangement made between its Mr. Atkins, Roy Barsh and Barsh Produce Company for the transportation of its wares in the course of his employment, and in the performance of a duty that it had given him the sole authority to perform (as Atkins testified), said Company is in no position to deny knowledge of said arrangement (see 2 Am.Jur., "Agency", sec. 380; Restatement of the Law, Agency, sec. 282), or to escape responsibility for the consequences of the operation of said unlawful scheme, arrangement, and conspiracy.

Furthermore, the Majority is incorrect in its apparent theory that Barsh Produce Company and Kerr Glass Manufacturing Company, in order to be liable, must have been guilty of some act of negligence which directly caused the accident. The Majority rationalizes as follows:

> "Plaintiff argues that there was causal connection in that if Barsh Produce Company had been licensed by the Interstate Commerce Commission they could not have employed an unqualified driver. This does not follow. It is true that Hall was not a qualified driver according to the Interstate Commerce Commission's Safety regulations, but even if Barsh Produce Company had been licensed they could have, nevertheless, employed an unqualified driver if they so desired."

There was sufficient evidence in this case to go to the jury on the question of defendant's liability for the truck driver Hall's negligence, had it *not* been established that he was physically unqualified under I. C. C. regulations. In Wooldridge v. Scott County Milling Co., Mo.App., 102 S.W.2d 958, 964, a Missouri case, plaintiff Wooldridge, a passenger in another vehicle, was injured in an accident with a ten-ton trailer truck. His judgment for damages for said injuries was against three defendants, namely: Wade, the truck driver; Sturgeon, who owned and operated the trucking service; and the appellant, Scott County Milling Company, a corporation, whose produce was being transported in the truck at the time of the accident. The appellant argued, on appeal, as follows:

> " 'There is no causal connection between the alleged violation of the statute by the Milling Company and plaintiff's injuries, and without it there can be no recovery.' "

There, the court said:

> "A reading of the petition will show that in the first part thereof it is alleged that the owner of the trucks had not complied with the statutes and the rules and regulations of the Public Service Commission in securing a permit to operate such trucks as a contract hauler upon the highways of this state. Such statutes and regulations were pleaded. The petition then alleged that this appellant, with full knowledge of said violation of the statutes and regulations by the owner, engaged and employed the defendants Sturgeon and Wade, and each of them, to use and operate said vehicles over the highways of this state in the transportation for hire of merchandise and property of said Milling Company, and that this appellant 'procured, aided and abetted said defendants, F. L. Sturgeon and Allen Wade, and each of them, in said violation of said laws and said rules and regulations of the State of Missouri' and that, by reason of said unlawful acts and conduct of said Milling Company, it became and is liable for all damages occasioned by the negligence of the defendants Sturgeon and Wade, or either of them, while engaged in such unlawful acts and conduct.

"We think this count of the petition alleges such acts and conduct of the parties to show that a conspiracy was entered into to violate the statutes and rules and regulations of the commission. If that be true then, as we herein hold, it follows that the doctrine of imputed negligence applies, and the causal connection is pleaded, for many authorities hold that, where two or more persons agree together to do an unlawful act, the act of each of the conspirators in carrying out the object of the conspiracy is the act of all, and they are jointly and severally liable for the damages occasioned by such conspiracy. (Citing cases)

\*     \*     \*     \*     \*     \*

"Defendant F. L. Sturgeon testified that he had no trucker's permit, and that he had told Mr. Bowman, the manager of appellant, that it was not lawful for him to haul appellant's products without a permit, and that Bowman said for him to send the trucks on down and take out the feed, and that he hauled many loads for the appellant thereafter. \* \* \*

"Bowman testified that he hired Sturgeon to haul the products of the mill to places where he wanted them delivered, and that his truck had hauled the products many times over the lapse of two or three years. \* \* \* He also said that he made out the invoices and the C. O. D. bills that Wade had in his possession with the cash collected thereon at the time of the injury. \* \* \*

"We think this evidence was at least sufficient to make it a question for the jury as to whether or not there was a conspiracy, and that the trial court did not err in overruling the demurrer to the evidence. Conspiracy may be proved by direct or circumstantial evidence, and may be inferred from proof of concerted action if the facts and the evidence justify a reasonable inference of the existence of the conspiracy, and these are matters for the jury's determination. \* \* \*" (Citing cases).

There the court recognized, as does the Majority, that the gist of a conspiracy action is in the injury, rather than the conspiracy, but added:

"We think the facts in this case are sufficient to make it a question for the jury as to whether or not there was a conspiracy, and, if there were a conspiracy, the proof of that is of value in permitting the plaintiff to hold one of the coconspirators responsible for the acts of another, \* \* \*"

The foregoing demonstrates the sufficiency of the evidence to support a conclusion by the jury that Kerr Glass Manufacturing Company, through its traffic manager, Atkins, and Barsh Truck Line, through its Roy Barsh, were actively participating in an unlawful conspiracy to violate the Interstate Commerce Act, supra; and that they were, in fact, as well as in law—under both state and federal decisions—primarily liable as joint tort feasors for the consequences of Hall's truck driving in the furtherance of said conspiracy. As I see it, the Majority misconstrues vital parts of the evidence, and disregards legal principles that, in my opinion, are applicable. It makes an unprecedented application of a theory taken from dictum of the North Carolina opinion, supra. Such a theory could not have been in the minds of those who drafted and executed the "Release And Covenant Not To Sue" involved herein. If so, obviously they would have acted differently. To hold that the plaintiff is thus deprived of the fruits of his $76,000 recovery by such act of his predecessor administrator, contrary to any such intention and contrary to the contemplation of the County Court, and those appearing before it, when it entered its order specifically authorizing the administrator to execute the instrument is, in my opinion, a denial of justice. I therefore respectfully dissent.