**Walter Robert TAYLOR,**
**Plaintiff-Appellant,**

v.

**Kevin M. GILMARTIN, Michael E. Trauscht, Wayne N. Howard, Freedom of Thought Foundation, Inc., Joseph Alexander, Esther Alexander, and Gary Scharff, Defendants-Appellees.**

No. 81–1215.

United States Court of Appeals, Tenth Circuit.

July 30, 1982.

Certiorari Denied Jan. 17, 1983.

See 103 S.Ct. 788.

John C. McMurry, Oklahoma City, Okl. (Martha McMurry, Oklahoma City, Okl., with him on the brief), for plaintiff-appellant.

William A. Johnson, Sanders, Boone & Johnson, Oklahoma City, Okl., for defendants-appellees Gilmartin, Freedom of Thought Foundation, Inc., Joseph Alexander, Esther Alexander, and Gary Scharff.

John B. Hayes, Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., for defendant-appellee Trauscht.

Albert R. Vermeire, Monbleau, Vermeire & Turley, Phoenix, Ariz., for defendant-appellee Howard.

Before DOYLE and SEYMOUR, Circuit Judges, and ANDERSON,* District Judge.

---

WILLIAM E. DOYLE, Circuit Judge.

Appellant seeks reversal of several judgments which grow out of the entry of summary judgments.

The actions arise out of alleged civil rights and common law claims. The former arise under 42 U.S.C. Sections 1983, 1985(2) and (3). The complaint describes conspiracy to commit legal malpractice, intentional infliction of emotional distress, false imprisonment and conspiracy to commit assault and battery. The appeal is pursuant to 28 U.S.C. § 1291. The essence of the case is an attempted religious deprogramming effort together with the means which were employed to accomplish the objective. The charges revolve around the particular circumstances which led up to the deprogramming, the actual techniques which were employed in an effort to persuade the subject to abandon the religion which he had adopted.

All of this commenced when Taylor took up residence in the monastery of the Holy Protection of the Blessed Virgin Mary, a local religious organization, in Oklahoma City, Oklahoma. Appellant had reached the age of 21 when the deprogramming effort occurred. Taylor's parents were opposed to his joining the religion and in July of 1976 they took the action which led to this cause. They employed an organization called the Freedom of Thought Foundation, a corporation which carries on the business of deprogramming religious zealots. Deprogramming is a process of attempting a psychological shock treatment on members of nonmainstream religious sects in an effort to sever their involvement with a religious cult lifestyle.

As part of the program, appellant's father, through Freedom of Thought, applied to the Oklahoma County District Court to be appointed as "temporary" guardian of the appellant. Appellees Howard and Trauscht, lawyers for Dr. Taylor, the father of appellant, visited Judge John A. Benson, an Oklahoma state district judge who was

---

* Honorable Aldon J. Anderson, Chief Judge, United States District Court for the District of Utah, sitting by designation.

temporarily assigned in Oklahoma City, and conferred with him ex parte. They asked him to hear the case. Benson contacted the Probate Judge who would ordinarily hear such a matter and obtained permission to hear it. Only after that was the petition for a guardianship filed. Judge Benson ordered the temporary guardian of plaintiff's person be appointed in order to determine whether plaintiff was under the influence of a religious cult. Judge Benson said that he wanted the plaintiff taken into custody "so that (plaintiff) could be given notice of a [permanent] guardianship hearing." Plaintiff was at the monastery when the deputies came for him. He offered no resistance. The hearing occurred before Judge Benson as soon as Taylor was brought in to court. Although Judge Benson found him to be normal, he formally entered an "order appointing Taylor's father as Temporary Guardian of the Person." The reason for the Judge's action was

"... the right of [Plaintiff's] father and ... family to know [Plaintiff] decided ... to spend the rest of [his] life away from them secluded in a monastery ... probably overrides any individual right [Plaintiff] might possibly have on a temporary basis ... to be free from ... custody." PX 1 at p. 52.

The July 15, 1976 order also provided:
1. Notice of the time and place of hearing is not required.
2. Dr. Walter Taylor is appointed the Temporary Guardian of the Person of Petitioner's child, to-wit: Walter Robert Taylor and that temporary Letters of Guardianship issue.
3. The Temporary Guardian of the person shall have power to: (a) take said proposed ward into Petitioner's personal custody to have proposed ward counselled, examined, and treated by persons including, but not limited to physicians, psychiatrists, psychologists, social workers and lay persons; (b) to keep said ward in Petitioner's custody, even in the event said ward wishes to leave said custody; and (c) such further powers as are necessary to exercise those above granted.
4. Further hearing in this matter will be held at August 13, 1976 at 3:00 P.M. at which time the ward is directed to show cause if any the ward has, why the Petitioner, Dr. Walter Taylor should not be appointed permanent Guardian of the ward's person,

.    .    .    .    .

On the basis of the order heretofore cited plaintiff was taken that same day, that is July 15, 1976, from Oklahoma City, Oklahoma to Akron, Ohio. He was not examined by physicians or psychiatrists. The only examination occurred on July 24 which was performed by Dr. Gilmartin, a psychologist, with apparently some experience in treating cult members. Taylor was held for approximately one week in Akron where he was kept at a motel and under constant guard. There followed the deprogramming. Taylor testified that he was abused in the following manner:

1. The defendants yelled at him constantly.
2. The deprogrammers worked in shifts or crews.
3. They said that they would have him tracked down by the state patrol if he escaped; that they would have him thrown in jail and deprogrammed in jail.
4. The deprogrammers threatened to have the police close down plaintiff's monastery; to have the temporary guardianship made permanent and to have the deprogramming continue indefinitely, to have plaintiff committed to a mental institution and to beat him.
5. He was deprived of sleep and was told that he would be subject to shock treatment. He suffered severe gastritis, diarrhea and abdominal cramping and when he complained, the deprogramming seemed to intensify.
6. They threw cold water on him, shined a light in his eyes, tore his clothing off, cut his hair and beard and they told him they called friends and religious leaders from a list plaintiff had given them of people who would vouch for him, and they stated that the friends reported his religion was not legitimate. The deprogrammers indicated the pressure would cease if plaintiff would renounce his religion.

On July 23rd or 24th, 1976, plaintiff was taken from Akron to Phoenix, Arizona, where apparently his mother was staying. He was held, still under guard, for the rehabilitation phase of the deprogramming. However, he escaped July 31, 1976 and returned to Oklahoma City and to the seminary. He has been there ever since. The record does not indicate that any effort was made to remove him from the seminary after this. Subsequently, Taylor instituted this present suit in the United States District Court for the Eastern District of Oklahoma against not only the deprogrammers, but also his parents and his brother. However, the Taylor family members were dismissed by an agreement prior to trial. The deprogrammers remain.

In his complaint Taylor sought damages compensatory and punitive. On December 30, 1978 the trial judge entered an order dismissing the § 1983 claim on the ground that the complaint failed to allege that the defendants acted under color of state law. The court rejected the defendants' contention that use of the Oklahoma state court for Dr. Taylor's appointment as temporary guardian and plaintiff's seizure by local police was tantamount to state action. The reason was that the Oklahoma judge and the police were ruled not to be members of any conspiracy with defendants, in that they did not share common goals; neither were they charged as defendants. However, on the same day the court granted partial summary judgment dismissing the claim for conspiracy to violate Taylor's civil rights pursuant to § 1985(3). The lower court noted that in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) the Supreme Court held that § 1985(3) encompassed a private conspiracy to violate thirteenth amendment rights and the right to interstate travel. However, the claim below failed because, as the court saw it, Congress did not have the power to reach a private conspiracy to violate rights protected under the fourteenth amendment. The judge rejected plaintiff's argument that § 5 of the fourteenth amendment provided the Congressional power.

A third cause of action was dismissed on December 30 of the same year. This was the legal malpractice claim against Wayne Howard and Michael Trauscht. Taylor's claim was that Howard and Trauscht, as attorneys, participated in experimental psychological treatment on plaintiff, filed an illegal guardianship proceeding in Arizona and lied to the Oklahoma court. The lower court found no attorney-client relationship between these defendants and Taylor and continued that this, as a matter of law, could not result in liability.

On December 28, 1979 the trial court granted a partial summary judgment for defendants on the conspiracy cause of action with respect to obstructing justice pursuant to 42 U.S.C. § 1985(2). The court's reasoning was the same as in the order on the § 1985(3) conspiracy claim. The orders entered on December 30, 1978 and December 28, 1979 were made applicable to all defendants by the order of July 8, 1980.

The matter of intentional infliction of emotional distress, which was also charged in the complaint, was disposed of on directed verdict. The court said that reasonable minds could not differ that defendants' conduct was not so extreme and outrageous as to call for recovery. Similarly, a directed verdict was granted to the defendants on the false imprisonment claim because the Oklahoma state court's temporary guardianship order was ruled proper.

The jury returned a verdict in defendants' favor on the one count that was submitted to the jury, the assault and battery claim which would appear to have been the weakest claim in the entire complaint in that there was no evidence indicating that assault and battery in the ordinary sense occurred.

We take up on appeal the propriety of the trial court's directed verdict on the tort claims of false imprisonment and intentional infliction of emotional distress, as well as the summary judgment orders on the civil rights statutes.

## THE INVALIDITY OF THE STATE COURT'S TEMPORARY GUARDIANSHIP ORDER

The Oklahoma law is very specific regarding the appointment of guardians. See

Title 58 §§ 851–52. Section 851 provides that any relative or friend of the proposed ward can petition the court as to the insanity or mental incompetency of the ward. Notice must be given to the alleged incompetent and to a near relative at least five days before the hearing. The form of notice to the near relative is at the court's discretion, however; the statute does not provide for the manner of notice to be given to the ward. Under § 852 a guardian may be appointed only after a full hearing where it appears to the judge that the alleged incompetent is incapable of "taking care of himself and managing his property." When using the terms "mentally incompetent", "incompetent" and "incapable", as above, these are defined as including one who is not adjudicated insane but, because of old age, disease, weakness of mind or other reasons, is unable without assistance to adequately care for his person or his property and, therefore, could be deceived by artful or designing persons. *In Re Guardianship of Bogan*, 441 P.2d 972 (Okl. 1968). Appellees' petition in the state court did allege that Taylor was incompetent under the definition in *Bogan*. However, at the temporary guardianship hearing no evidence was adduced from Dr. Taylor that Walter was unable to take care of himself or his property or that he had any property that others could by trick or deceit remove from his control. Indeed appellant testified that the monastery took none of his assets. Dr. Taylor testified that the monastery took everything his son had but did not detail what this may have been. It seems evident that appellant did not have or give over to the monastery any assets of substantial value. There is no need to decide whether the guardianship order under § 852 was inappropriate because of lack of evidence as to mental infirmity, for there are serious jurisdictional errors to be considered.

The case of *Tiger v. McCallom*, 89 Okl. 249, 214 P. 194, 195 (1923) holds that Oklahoma law is settled that the appointment of a guardian is uniquely a creature of statute. In the absence of full compliance the court lacks jurisdiction and the order is void. *See Martin v. O'Reilly*, 81 Okl. 261, 200 P. 687 (1921). There is no

Oklahoma law to be found allowing a temporary guardianship of an adult such as was carried out by Judge Benson. The section referred to above, § 851, requires five days notice prior to the guardianship hearing. Appellees contend that Taylor received thirty days notice because Judge Benson personally notified appellant when he was before him that the permanent guardianship would be held thirty days hence. That does not cure the failure to give notice of the initial hearing appointing a temporary guardian. That is just one of the problems with it. However, the real issue is the inadequacy of the hearing and the temporary order that was issued. The only conclusion to be drawn is that Judge Benson's action was beyond the statutes and was void from the very beginning. The court, as we view it, acquired no jurisdiction to hear this proceeding under § 852 until the five days notice had lapsed. *In Re Winnett's Guardianship*, 112 Okl. 43, 239 P. 603 (1925).

It is the position of the appellees that Okl.Stat.Tit. 43A, § 55 gives broad powers to a district judge to order temporary guardianship while a competency determination is made. This is not so. Examination of this statute in the light of the procedures employed by Judge Benson shows that under no stretch of the imagination does § 55 serve to shield appellees. As originally enacted in 1953 § 55 permitted the court to detain the alleged mentally ill person "in some suitable place" for up to thirty days until his petition was heard. Such temporary detention could only be brought about if there was testimony satisfying the judge that the individual was violent or that he would injure himself. The 1975 amendment to § 55 altered the temporary detention language. As this statute stood at the time of Taylor's hearing, on July 15, 1976, the court was empowered to detain appellant in some appropriate medical facility in the county where proceedings were pending for no longer than seventy-two hours, including Saturdays, legal holidays and when the district court was not officially in session. But this could be done only if it was shown, as had

been true under the 1953 act, that the alleged mentally ill person was violent or might injure himself or others.

Apart then from the failure to comply with the temporary detention requirements of § 55, it is plain that the hearing in Judge Benson's court was not styled as a mental health hearing to determine whether Taylor should be committed to the state mental hospital or to a private facility, as required by statute. Apparently the judge fashioned this order to suit something that was not even provided for in any statute. Appellees' petition to Judge Benson, as mentioned above, invoked only the language of 58 O.S. § 851. Section 55 requires a petitioner to seek an order directing the hospitalization of one who is asserted to be mentally ill. Commitment was not a subject even mentioned at the temporary hearing.

Section 55 requires that upon receiving the petition the court appoint a sanity commission under § 54, Title 43A. This commission is to be composed of two qualified examiners and one licensed actively practicing attorney and is to certify its findings on the mental health of the person under examination. Judge Benson, of course, appointed no sanity commission. The judge considered the guardianship order to be for the purpose of determining whether Taylor had been brainwashed in the monastery, not whether he was mentally ill and should be hospitalized, an objective which, of course, is not provided for in any Oklahoma statute. If Taylor had been committed pursuant to §§ 54 and 55 under the procedures observed by the state court, the commitment would have to be reversed for the failure to follow the procedures of these sections. This failure is not harmless error. *In Re D.B.W.*, 616 P.2d 1149 (Okl.1980). Due to the fact that no statutory jurisdiction gave rise to this temporary guardianship order and due also to the fact that there was no proper notice, even were we to assume authority for the proceeding, the order is void.

## THE VALIDITY OF THE FALSE IMPRISONMENT CLAIM

The trial court directed a verdict for the appellees on the false imprisonment claim and the reason for that was the trial court's determination that Judge Benson's temporary guardianship order was proper; that any imprisonment could not be false in view of the lawfulness of the order. We must disagree with the action taken by the trial court.

The argument of the appellees is that the false imprisonment claim is a collateral attack on the temporary guardianship order. Where a judgment appointing a guardian appears to be regular on its face, so it is argued, there is jurisdiction for such an order and it cannot be attacked collaterally. The case that is cited is *Bartlett v. Bell*, 125 Okl. 236, 257 P. 309 (1927). Concededly, though, where the order is void on its face, a collateral attack is permissible. *Mock v. Stricklin*, 315 P.2d 247 (Okl.1957). In the case before us the facts are such as to support the conclusion that there is a lack of jurisdiction and voidness in Judge Benson's order. The temporary guardianship order no longer exists. It was dissolved by Judge Benson on August 19, 1976. There remains, however, the question whether the order purporting to create a temporary guardian shields the deprogrammers from legal action.

It is, of course, fundamental that an action for false imprisonment arising from a commitment or guardianship order is not cognizable where there has been regular and legal process observed, where the order is regularly issued with authority to issue the order and lawfully executed.[1] In the decision of the Oklahoma court in *Yahola v. Whipple*, 189 Okl. 583, 118 P.2d 395, 397, the court said: A person who causes the arrest of another in a civil proceeding must answer in damages even though the arrest was in pursuance of an order of court, when the court issuing the order has exceeded its jurisdiction, or had no authority to do so.

---

1. *Guzy v. Guzy*, 16 Misc.2d 975, 184 N.Y.S.2d 161 (1959), aff'd. 11 App.Div.2d 1047, 206 N.Y.S.2d 355 (1960); *Mezullo v. Maletz*, 331 Mass. 233, 118 N.E.2d 356 (1954); *Dedrick v. Durham*, 136 Wash. 265, 239 P. 385 (1925). *See, Yahola v. Whipple*, 189 Okl. 583, 118 P.2d 395, 397 (1941).

Process is regular on its face when it comes from a court with authority to issue process of the kind in question, is legal in form and contains no signs that would fairly apprise one that such process is issued without authority. *Jackson v. Osborn*, 116 Cal.App.2d 875, 254 P.2d 871, 876 (1953).

■ From a consideration of the statutes of Oklahoma in relationship to Judge Benson's order, it must be concluded that under those applicable statutes such a temporary guardianship order imposed on an adult was, and is, beyond the state court's power. An unauthorized judicial command furnishes no protection to those who act under it. *Weigel v. Brown*, 194 F. 652, 656 (8th Cir. 1912). In view of the fact that this order was void, the false imprisonment claim should have been submitted to the jury.[2]

## THE CLAIM OF INTENTIONAL INFLIC-TION OF EMOTIONAL DISTRESS CAUSED BY DEPROGRAMMING

The plaintiff relies on the following to show that the conduct of the deprogrammers was extreme and outrageous. He points to his having been taken forcefully and against his will, removed from his chosen environment and removed also to another state and to his being kept there for a period of several days while they went through this deprogramming. He also relies on the evidence described above having to do with the rough and cruel treatment which he claims to have received.

Appellant argues that the deprogrammers' threats and actions for a week in trying to force him to give up his faith were as severe as any example of intentional infliction of emotional distress that the Second Restatement of Torts § 46 gives. Thus, there is one example in the Restatement involving the practical joker who falsely told his wife that her husband had been badly injured. This was shown in the Restatement as being outrageous conduct. *Id.*, Comment d, illustration 1.

■ The trial court relied on *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okl. 1978) as supporting his order directing the verdict on the issue of extreme conduct. The *Breeden* court held that a collection agent's conduct was not outrageous where he mailed three letters to the debtor's home and called her at work once. He attempted to reach her by phone several times. He spoke to her only once and used abusive language. However, it certainly is arguable that the conduct that was present in the *Breeden* case was far less abusive and excessive than the conduct here. Oklahoma law requires an initial determination that the conduct was extreme and outrageous before the court has to decide if the evidence supports a finding of severe emotional distress. If it does, the jury then determines if severe emotional distress existed. The trial court held that the case at bar did not get beyond the first hurdle. Appellees paint a picture of the deprogramming process as being therapeutic. They claim that it provided psychological help to Taylor to be exposed to a discussion of his religious beliefs. They maintain that all the actions were pursuant to court order. Their claim is that there was no intentional or reckless conduct on their part designed to inflict severe emotional distress. This course of conduct was just Taylor's parents acting through the appellees to cure their son.

■ The trial court directed a verdict against Taylor on the intentional infliction of emotional distress because he did not think that deprogramming per se was sufficient to constitute the outrageous conduct as required by the case of *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okl. 1978). The trial judge also said that he did not "think that the conduct of the defendants in carrying out their efforts, as shown by the evidence, constituted outrageous conduct." This loses sight of the fact that a trial court may direct a verdict only where the evidence and all the inferences from it

---

2. Appellant argued below that the order of Judge Benson was void because Taylor was not permitted counsel of his choice, a man connected with the Old Catholic monastery. Moreover, Taylor claims that the state court's order was void because a second state judge later countermanded Judge Benson's temporary guardianship order. In view of our decision on the false imprisonment claim, we need not address these alternative grounds for decision.

are so clear that reasonable minds could not differ on the conclusion to be drawn. *Taylor v. National Trailer Convoy, Inc.*, 433 F.2d 569, 571–72 (10th Cir. 1970). It is incumbent on the trial judge to view the evidence in the light most favorable to the non-moving party. *Swearngin v. Sears, Roebuck & Co.*, 376 F.2d 637, 639 (10th Cir. 1967). All of the evidence on both sides of the case ought to be considered in making this decision because eventually the court is going to have to pass on it and evaluate it. *Christopherson v. Humphrey*, 366 F.2d 323, 325 (10th Cir. 1966). The court is not at liberty to disregard the evidence on behalf of the plaintiff in the case. The jury is entitled to weigh conflicting evidence and inferences and determine the credibility of witnesses. The court should accept as true the evidence of the non-moving party. *Anderson v. Hudspeth Pine, Inc.*, 299 F.2d 874 (10th Cir. 1962).

█ Oklahoma has adopted § 46 of the Restatement of Torts which recognizes the tort of intentional infliction of emotional distress and it is for the trial court to determine whether the defendant's conduct is so extreme and outrageous as to permit recovery. Where reasonable people may differ, the jury is to decide if the conduct "has been significantly extreme and outrageous to result in liability." The court must decide if severe emotional distress occurred. The *Breeden* court upheld a grant of summary judgment against the plaintiff where, as noted above, she had been harassed by a collection agency's letters and phone calls. This was not comparable to this case involving, as it does, kidnapping, imprisonment and severe harassment. *Breeden* is not comparable to the case at bar. The appellant was not only taken into custody by sheriff's officers and removed to the court, but he was also taken to Ohio for the purpose of this deprogramming effort. He was kept in a motel for over a week while the deprogrammers did their worst to clear his mind of any desire to continue with his religion. They threatened to have the guardianship continue indefinitely and concomitantly to continue deprogramming him for as long as necessary. He was threatened with commitment and beatings.

He claims he suffered physical sickness during the time that he was being deprogrammed because of their actions and threats. His statements are not corroborated by any of the deprogramming team. Obviously they are not going to concede anything of that kind. His testimony is entitled to the weight of any other witness. His credibility is for the jury.

In *Breeden* the court said "the outrageous or extreme conduct required may arise from abuse of a position or relationship which gives the actor actual or apparent authority over another." 575 P.2d at 1377. Here we have that factor. They had at least apparent authority over him and they may have believed, indeed they hoped, that their actions were under the protection of the court. They were taking advantage of the temporary guardianship order to alter his way of life by psychological shock treatment. This was a clear abuse of trust in addition to the excessive conduct.

The law on this intentional infliction of emotional distress is relatively meagre. In *Reeves v. Melton*, 518 P.2d 57 (Okl.App. 1974), the court held that an emotional distress claim was proper where the defendant terrorized the plaintiff over a disputed payment on a television. Testimony on behalf of the plaintiff was that the defendant threatened to kill the dogs at her house and banged on all her doors and windows and lunged at the front door in an attempt to break in. In *Bennett v. City National Bank and Trust Co.*, 549 P.2d 393 (Okl.App.1976) a bank officer threatened to ruin a plaintiff's credit and made a series of threatening phone calls over a debt owed the bank by Bennett's son. Plaintiff suffered physical anxiety and distress because she had bought many items on credit and she was afraid defendant would carry out his threat. This was held to be sufficient to give rise to a claim for emotional distress.

In *Munley v. ISC Financial House, Inc.*, 584 P.2d 1336 (Okl.1978) the *Breeden* decision was followed. However, the defendant's behavior in *Munley* as in *Breeden* was mild compared to that which was found in *Bennett* and *Reeves*. ISC Financial House was seeking to track down plaintiff's husband about a debt by coming to her home

repeatedly to ask about Munley and by contacting plaintiff's neighbors and her former employer.

Finally, the value of the *Breeden* decision is solely for providing a test to judge the appropriateness of sending this claim to a jury. It is the facts of a case which dictate the application of this test. This count should have been submitted to the jury.

## DID THE COURT ERR IN DISMISSING THE CLAIM WHICH AROSE UNDER 42 U.S.C. § 1983

■ The order dismissing the § 1983 claim must be affirmed. The color of law requirement which is part and parcel of § 1983, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970), is not satisfied under the facts of the case. It is impossible to say that the use of the court as part of the scheme, as occurred here in this case, is enough to constitute state action. The court was not a part of the conspiracy. At most the conspirators made use of the court in an effort to obtain some official appearance. The court allowed itself to be used without fully realizing the results which would follow.

In *Torres v. First State Bank of Sierra County*, 588 F.2d 1322, 1326 (10th Cir. 1978) it was held that there was no state action involved in a suit between private litigants where the state merely furnishes the forum. In the *Taylor* case the complaint stems from the order of temporary guardianship by the Oklahoma court. The judge is not a defendant, nor is any state officer, nor can it be said that the judge was a conspirator. Section 1983 just does not apply. *See Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).[3]

## THE CLAIMS UNDER 42 U.S.C. § 1985(2) and (3)[4]

■ In support of claims under subsections 2 and 3 of § 1985 plaintiff alleges that

---

**3.** We have examined the recent opinion of the United States Supreme Court in *Lugar v. Edmondson Oil Co.*, —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In *Lugar,* Justice White, speaking for five members of the Court, held that a § 1983 claim is made out when the deprivation of a federal right is *attributable* to the state. Such attribution can only be shown if 1) a deprivation is caused by the exercise of a right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible and 2) the party charged is a "state actor." One is said to be a state actor if one is a state official or a private person who acted together with or obtained significant aid from a state official or where there is conduct otherwise chargeable to the state.

The majority held that petitioner Lugar's claim that Virginia's prejudgment attachment statute was constitutionally defective fulfilled the "under color" of law requirement. A second due process count alleged that the state court denied Lugar procedural due process by its unlawful acts contrary to state law. The under-color-of-law language was not satisfied by this claim because, if true, respondent, Edmondson Oil, acted contrary to articulated state policy: "That respondent invoked the statute without the grounds to do so could in no way be attributed to a state rule or decision." *Id.* at B3903. Therefore, even though a private party's joint participation with state officials can label one as a state actor, a state court's action in violation of state law cannot be remedied by § 1983 where only a private party is charged.

In the case before us, we do not read Taylor's complaint to allege that Oklahoma's guardianship statute is constitutionally defective. Rather, the gravamen here is that Judge Benson acted in contradiction to state procedures. Under the recent ruling in *Lugar* our views on § 1983's applicability in this situation are unchanged. We note in passing that the majority limited *Lugar* to the factual situation where a prejudgment attachment order is at issue. *Id.* at 102 S.Ct. at 2755 n.21.

**4.** (2) [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws ...;

(3) If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

the defendants conspired to and did deprive him of the equal protection of the laws of the United States, including plaintiff's right to freedom of religion and association and his right not to be deprived of his liberty without due process, by the wrongful use of the judicial system and the sheriff's office in Oklahoma County, Oklahoma. The purpose of the conspiracy, according to the allegations, was to coerce plaintiff into changing his religious beliefs and practices. Further allegations are that defendants conspired to impede, hinder, obstruct and defeat the course of justice in the state court of Oklahoma by obtaining an illegal temporary guardianship based on false representations, and in Arizona by maliciously filing redundant and superfluous guardianship proceedings based on false allegations that no guardianship proceedings were pending elsewhere. The trial court rejected the above described claims, doing so by granting the defendants' motion for summary judgment. Both counts under § 1985(2) and under § 1985(3) were dismissed even though the court conceded that the plaintiff's allegations were within the broad language of both § 1985(2) and (3). The court concluded that there was a lack of power to reach the private conspiracy so alleged. The district court determined that although Taylor's complaint described a cognizable claim under § 1985, there was a lack of congressional power to reach the type of injury or wrong that was alleged.

The parts of § 1985(2) and (3) relevant to this case derive from the original § 2 of the Civil Rights Act of 1871, 17 Stat. 13 (1871). See Kimble v. D. J. McDuffy, Inc., 648 F.2d 340, 344 & n.5 (5th Cir. 1981). For this reason, the same general analysis applies to the two sections. See Smith v. Yellow Freight System, Inc., 536 F.2d 1320, 1323 (10th Cir. 1976). Because there is a dearth of decisional law interpreting § 1985(2), our primary focus will be on § 1985(3).

What are the facts that are present here to support this theory? They are alleged by the plaintiff in his complaint, namely his right to freedom of religion and association, and his right not to be deprived of his liberty under due process of law by the wrongful use of the judicial system and the sheriff's office in Oklahoma County, Oklahoma.

It will be recalled that the defendants approached a state district judge who was temporarily serving in Oklahoma City and that judge upon being told of the problem authorized the issuance of an order to bring the plaintiff into court. Officers from the sheriff's department were employed to execute the order. Thereupon a hearing was held in the district court even though there was no statute provided for hearing under these circumstances, that is to say where the individual involved, the plaintiff, had not committed a crime or was not shown to be insane. Nevertheless the judge fashioned a remedy to cover the situation. He brought the plaintiff, Taylor, in and conducted a hearing and following that hearing delivered Taylor into the custody of the defendants in order for them to work their magic on him to deprogram him. A further allegation is that the defendants conspired to obstruct and impede the due course of justice in the state court by obtaining an illegal temporary guardianship based on false representations and doing somewhat the same thing in Arizona.

Griffin v. Breckenridge, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–1799, 29 L.Ed.2d 338 (1971) sets forth the requirements that must be met by a plaintiff seeking to state a claim under § 1985(3):

> To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another person was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

All of the first, third and fourth elements are clearly present and the trial court so found. If some of the defendants were not

members of the conspiracy, then that is a matter that should be decided by the jury at the trial. Certainly they joined in the action that took place and many acts were done in furtherance of the alleged conspiracy, including the obtaining of the guardianship and the conducting of the deprogramming. Plaintiff's allegation of injuries surely satisfies the fourth element. The issue is whether the second element quoted above is established. This requires a purpose to deprive any person of the equal protection of the laws, or of equal privileges and immunities under the laws. *Griffin* construed it as having two parts: a "racial, or perhaps otherwise class-based, invidiously discriminatory animus," which "aim[s] at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798.

Is there a class-based invidious discrimination under the meaning of the *Griffin* decision? It should be emphasized that these defendants are professionals. They perform this service for money and they spend a significant amount of time on it. The record shows that and certainly their conduct is odious and has the effect of depriving the victim of important rights—his liberty, his freedom, his right to practice his religion, among other rights.

The Court in *Griffin* did not hold that only a racial bias would satisfy the requirement of class-based invidious discrimination. 403 U.S. at 102, n.9, 91 S.Ct. at 1798, n.9. Justice Stewart left this question open. In *Silkwood v. Kerr-McGee*, 637 F.2d 743, 748 (10th Cir. 1980), we noted that the legislative history of the 1971 Civil Rights Act, the source of § 1985(3), contains an explanation by Senator Edmunds of the type of conspiracies to be remedied by the Act:

> We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent one getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please *or*

*because he was a Catholic, or because he was a Methodist,* or because he was a Vermonter, . . . then this section could reach it.

Cong.Globe, 42d Congress, 1st. Sess. 567 (1871) (emphasis added). Such language clearly encompasses an "irrational and odious class discrimination based on national origin or religion." *Arnold v. Tiffany*, 359 F.Supp. 1034, 1036 (D.C.Cal.), *aff'd on other grounds*, 487 F.2d 216, 218 (9th Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

In the present case the trial court concluded:

> [A] fair and reasonable reading of plaintiff's complaint demonstrates that the defendants singled out plaintiff because of his status as a member of the Old Catholic Church, and not because of his individual beliefs. In other words, this class status is not created by the mere fact that plaintiff possesses the right to freedom of religion, as do all persons, but rather by the fact that he is a member of a fringe or minority religious group. It is the defendants' abhorrence of that group that motivates them to deprogram individuals such as plaintiff.

The record before the court at the time of the summary judgment motions bears out its conclusion. The record certainly supports the statement of the trial judge immediately above. As an example, in its application for an exemption under the Internal Revenue Code, the Freedom of Thought Foundation responded to a question regarding its area of public interest or concern: "The illegal and immoral techniques used by so-called Religious Cults to induce mind control and brainwashing of young adults...." Dep. of Michael E. Trauscht, Ex. 3.

Other courts have reached a similar conclusion. *See Baer v. Baer*, 450 F.Supp. 481 (N.D.Cal.1978), 491. *See also Ward v. Connor*, 657 F.2d 45, 47–48 (4th Cir. 1981); *Rankin v. Howard*, 457 F.Supp. 70, 74 (D.Ariz.1978); *but see Weiss v. Patrick*, 453 F.Supp. 717, 723–24 (D.R.I.1978).

We conclude as did the trial court that there is adequate evidence of the type of

class-based, invidiously discriminatory animus envisioned in *Griffin* to overcome a motion for summary judgment. Whether the defendants were in fact motivated by the alleged animus against religious minorities is, of course, a question for the jury.

In *Griffin*, Justice Stewart, speaking for the Court, held that the absence from § 1985(3) of the phrase "under color of any statute, ordinance, regulation, custom or usage, of any state ..." which is present in § 1983 distinguished these two statutes so that § 1985(3) circumscribed private conspiracies. Once this determination was made, the Court then examined Congress' power to constitutionally reach such private conspiracies. Two sources were found: § 2 of the thirteenth amendment, and the right of every citizen to travel interstate. *See* 403 U.S. at 104–06, 91 S.Ct. at 1799–1800. No issue exists in this case of race discrimination prohibited by the thirteenth amendment. Furthermore plaintiff did not allege in his complaint that an object of defendants' conspiracy was to deprive him of his right to travel interstate. He now urges this as a basis to uphold his claim under § 1985(3). However, the facts do not lend themselves to a claim of interference with this right.

Because appellant's complaint has alleged conduct violative of his first amendment right to freely practice his religion and his right to unhindered associations, as well as equal protection and due process claims, we must look to the fourteenth amendment as the applicable source of power here to reach the conspiracy alleged. While the suit .before us alleges a private conspiracy in the sense that the named defendants—those who transported and sought to deprogram the plaintiff—are not state officers, nevertheless, there is no dearth of state involvement as a result of the cooperation of the judges and the sheriff's officers.

The lower court characterized the § 1985 complaint as seeking a remedy for a purely private interference with fourteenth amendment rights. It has been traditionally viewed that the fourteenth amendment provides no protection against private action. *District of Columbia v. Carter*, 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). We, of course, adhere to the Court's dictates in this area.

In the case at bar, however, the allegations extend beyond the private deprivation of constitutional rights. The contention is that the defendants formed a conspiracy *to cause the state to participate and deprive the plaintiff* of his liberty without due process and to interfere with his first amendment freedom of association and religion due to their hatred of minority religions. If these allegations are true, then they may indeed be remedied by § 1985(2) or (3).

It is our position that the district court was wrong in reaching the conclusion which it reached. We believe that § 5 of the fourteenth amendment is the source of congressional power. This is the provision which authorizes Congress to provide a remedy where private parties conspire to induce the state to deprive an individual of his constitutional rights. Section 5 of the fourteenth amendment provides: "The Congress shall have the power to enforce by appropriate legislation the provisions of this article." The fourteenth amendment, prohibits any state from depriving an individual of life, liberty, or property without due process of law, or from depriving an individual of the equal protection of the laws. *Katzenbach v. Morgan*, 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966), held that § 5 of the fourteenth amendment was intended to grant to Congress the same broad powers to enforce the fourteenth amendment as are expressed in the Necessary and Proper Clause of Article I, section 8, clause 18 of the Constitution. It is this broad authority which gives to Congress the power, exercised in § 1985(2) and (3), to provide a remedy against conspiracies whose object is to cause the state to deprive an individual of his first and fourteenth amendment rights.[5]

As we view it our position here is in accord with the position that was taken by

---

5. A number of commentaries support this conclusion. *See, e.g.,* Comment, A Construction of

Section 1985(c) in Light of Its Original Purpose,

six of the Justices of the Supreme Court in *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). In that case six defendants were indicted in Georgia for criminal conspiracy violative of 18 U.S.C. § 241 [6]. This is the remaining criminal counterpart of § 1985 [7]. The defendants were accused of conspiring to deprive black citizens of the right to equal utilization of public facilities owned and operated by the State of Georgia by causing their arrest through false reports of criminal acts. The court held that the indictment contained sufficient allegations of state cooperation in the means of accomplishing the object of the conspiracy to preclude dismissal of the indictment. *Id.* 383 U.S. at 756, 86 S.Ct. at 1177.

There was a separate concurrence of Justice Clark, joined by Black and Fortas, which stated:

> The Court carves out of its opinion the question of the power of Congress, under § 5 of the Fourteenth amendment, to enact legislation implementing the Equal Protection Clause or any other provision of the Fourteenth amendment.... [T]here now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—*that interfere with fourteenth amendment rights.*

*Id.* at 762, 86 S.Ct. at 1180 (emphasis added). Justice Brennan wrote a separate

opinion which was joined in by Chief Justice Warren and Justice Douglas. Brennan's view was that the Court was requiring active connivance by agents of the state in order for there to be a violation of 18 U.S.C. § 241:

> I cannot agree with that construction of § 241. I am of the opinion that a conspiracy to interfere with the right to equal utilization of state facilities described in the second numbered paragraph of the indictment is a conspiracy to interfere with a 'right ... secured ... by the Constitution' within the meaning of § 241—without regard to whether state officers participated in the alleged conspiracy. I believe that § 241 reaches such a private conspiracy, not because the fourteenth amendment of its own force prohibits such a conspiracy, but because § 241, as an exercise of congressional power under § 5 of that amendment, prohibits *all* conspiracies to interfere with the exercise of a 'right ... secured ... by the Constitution' and because the right to equal utilization of state facilities is a 'right ... secured ... by the Constitution' within the meaning of that phrase as used in § 241.

*Id.* at 777, 86 S.Ct. at 1188 (footnote omitted) (emphasis in original).

The inference to be drawn is that the six Justices in *United States v. Guest, supra*, adopted the position that a private conspiracy which interferes with fourteenth

---

46 U.Chi.L.Rev. 402, 432, 436 (1979); Wildman, 42 U.S.C. § 1985(3)—A private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved, 17 San Diego L.Rev. 371 (1980); Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv. L.Rev. 91, 102 (1966).

**6.** If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

**7.** The criminal analogue to § 1985(3), § 5519 of the Revised Statutes (Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13, repealed, Act of March 4, 1909, ch. 15, 35 stat. 1153), was held to be unconstitutional in *United States v. Harris*, 106 U.S. 629, 639, 1 S.Ct. 601, 609, 27 L.Ed. 290 (1882). The Court interpreted § 5519's reach to encompass private conspiracies to violate the fourteenth amendment. *Harris* struck down the statute because of an overly narrow view of the severability of statutes that were only partially constitutionally deficient.

amendment rights by preventing the state from granting equal treatment or by causing the state to deprive a citizen of his constitutional rights is sufficient state action within the power of Congress to remedy under § 5 of the fourteenth amendment, notwithstanding the state is not actually one of the conspirators.

Justice Stewart's majority view in *Guest* is also analogous to the case before us. The majority was able to avoid deciding whether Congress under § 5 of the fourteenth amendment could reach a private conspiracy to violate the rights or privileges secured by the Constitution or federal laws because Justice Stewart found sufficient state involvement alleged in the indictment. The defendants were said to have induced the arrest of blacks through false reports that these blacks had committed criminal acts. 383 U.S. at 756, 86 S.Ct. at 1177.

This analysis is fully applicable to the case at bar. The activity here in effect brought the state into a position which was tainted. The purpose was not to help Taylor, the allegedly sick man, by treating him or showing concern for him, but rather to participate in coercing a change in this adult's religious beliefs and it was but a prelude to what was to happen. If, as Mr. Justice Stewart said in *United States v. Guest, supra,* that some limited state involvement may suffice, it clearly follows that the extensive state involvement in this case would certainly satisfy a necessary requirement.[8]

In his separate concurrence in *Great American Savings & Loan Ass'n.,* 442 U.S. 366 at 383–84, 99 S.Ct. 2345, at 2354–2355, 60 L.Ed.2d 957, Justice Stevens expressed a view consistent with such a conclusion when he said:

> Some privileges and immunities of citizenship, such as the right to engage in interstate travel and the right to be free of the badges of slavery, are protected by the Constitution against interference by

private action, as well as impairment by state action. Private conspiracies to deprive individuals of these rights are, as this Court held in *Griffin v. Breckenridge,* 403 U.S. 88, 29 L.Ed.2d 338, 91 S.Ct. 1790, actionable under § 1985(c) without regard to any state involvement. Other privileges and immunities of citizenship such as the right to due process of law and the right to the equal protection of the laws are protected by the Constitution only against state action. *Shelley v. Kraemer,* 334 U.S. 1, 13, 92 L.Ed. 1161, 68 S.Ct. 836, [842] 3 A.L.R.2d 441. If a state agency arbitrarily refuses to serve a class of persons—Chinese Americans, for example, see *Yick Wo v. Hopkins,* 118 U.S. 356, 30 L.Ed. 220, 6 S.Ct. 1064—it violates the fourteenth amendment. *Or if private persons take conspiratorial action that prevents or hinders the constituted authorities of any state from giving or securing equal treatment, the private persons would cause those authorities to violate the fourteenth amendment; the private persons would then have violated § 1985(c).* (footnotes omitted) (emphasis added).

It is true that although the appellant does not claim that the state conspired to deprive him of his constitutional right, he does claim that the state unwittingly deprived him of those rights when the sheriff's deputies forced Taylor to appear before Judge Benson under no apparent statutory authority and when the state court appointed his father temporary guardian without any jurisdiction, whereby he was illegally delivered over to the defendants and was deprived of his freedom of association and his freedom to pursue his religious beliefs. We must hold that a private conspiracy, if this be such, motivated by a class-based, invidiously discriminatory animus, to induce the state to violate one's first and fourteenth amendment rights is remedied by § 1985(2) and (3).[9] The participation and

---

8. The state's position in this kind of a situation is nicely summed up in a note, The Scope of Section 1985(3) Since Griffin v. Breckenridge, 45 Geo.Wash.L.Rev. 239, 250, n. 90 (1977). There it was said "the state is not the generator

of the wrong perpetrated but is the mechanism used to carry it out."

9. It should be clear from our holding on § 1983 in this decision that the defendants' use of the state court to attain what may prove to be

contribution of the state officers was a considerable factor in the ultimate activities of these defendants.

## THE CONNECTED MATTERS

The appellant raises a number of alleged errors contending that there was abuse of discretion by the trial court. We do not consider any of these.

■ The appellees Howard and Trauscht have contended that the covenant not to sue Dr. Taylor and his wife that was signed by appellant Taylor should prevent this suit. They claim that under the doctrine of *Barsh v. Mullins*, 338 P.2d 845 (Okl. 1959) this covenant not to sue releases them because they are non-acting conspirators whose only liability could arise under respondeat superior. Dr. Taylor, they say, is the only active conspirator; that he initiated the petition for guardianship and, since he is no longer a party, they cannot be held liable. We disagree with all of this. First, the *Barsh* case does not apply. These appellees are not non-acting conspirators. Their liability, if it is established, results from active participation in securing the guardianship order and in removing Taylor to Akron and then participating in the actual deprogramming. These are professionals, it should be remembered. They do this for pay. These men had contracted with Taylor to bring appellant home free of any cult influence. They signed a retainer agreement and a consultant agreement for substantial monetary considerations and received a large amount of money. The *Barsh v. Mullins* case is not applicable whatsoever. In *Barsh* the plaintiff claimed that defendants Ray Barsh Truck Lines and Ken Glass were liable in a civil conspiracy which occurred following a wrongful death in an auto accident. The active participant, Hall, a truck driver who collided with decedent, and his employer Barsh Produce were released from liability by the administrator of decedent's estate. The remaining defendants were non-actors and their only liability was through the use of respondeat superior. Howard and Trauscht attempt to rely on the statement by the *Barsh* court

unconstitutional goals is not tantamount to ac-

that when conspirators are to be held liable for the acts of co-conspirators when the object of the conspiracy is not to damage anyone, such liability is based on the principal-agent theory. The release of those primarily negligent releases the other conspirators. Unlike Ken Glass and Barsh Produce, Howard and Trauscht were active conspirators.

■ Two other distinctions deserve mention. No release of Dr. Taylor and his wife is present in the covenant not to sue. One who covenants not to sue does not surrender his action, but merely agrees not to enforce it. Under Oklahoma law a covenant not to sue in favor of one joint tort-feasor does not release others unless it was so intended. *Allen v. Ouachita Marine and Industry Corp.*, 606 P.2d 607, 609 (Okl. App.1980). Another difference between *Barsh* and the instant case is the presence of the issue of intent to damage by the unreleased co-conspirators. *Barsh* held that the lack of intent to damage the plaintiff was essential to extinguishing any action against the non-covenanting conspirators. While, from the standpoint of Howard and Trauscht, no damage to Taylor may have been intended, their concept of their motives may not be accepted by this court. The participation of Howard and Trauscht in obtaining this void court order and the deprogramming demonstrates their involvement in the tortious conduct. For these reasons their argument for release through the covenant not to sue must be rejected.

## CONCLUSION

■ One previously mentioned item which must be emphasized is the appellees' attempted use of these insanity statutes in an effort to develop an immunity defense in which an adult person who does not show any evidences of insanity is subjected to excessive conduct. This is a misuse of the state insanity-guardianship or conservatorship statutes having a clear purpose to get some kind of court protection of deprogramming. This should not be allowed. In *Katz v. Superior Court*, 73 Cal.App.3d 952,

tion under "color of law" as defined by § 1983.

141 Cal.Rptr. 234 (Ct.App.1977) the intermediate appellate court rejected the use of the California probate code's conservatorship statute against five adult children who were involved in a cult religion. The statute was said to be too vague to justify the appointment of a temporary conservator, and the appointment violated the free exercise rights of the adults. No evidence at the hearing demonstrated that appellants were unable to care for themselves. The phrase in § 1751 of the California Probate Code "likely to be deceived or imposed upon by artful or designing persons" was held to be unconstitutionally vague when applied to religious beliefs. 141 Cal.Rptr. at 244. Similar language has been used by Oklahoma courts to interpret Title 58, § 852. The court in *Katz* took a strong stand against licensing kidnapping for the purpose of thought control. *Id.* at 253. Its sentiments are shown by the following: "in the absence of such actions as render the adult believer himself gravely disabled ..., the process of this state cannot be used to deprive the believer of his freedom of action and to subject him to involuntary treatment." *Id.* at 256. In the case before us the exposure of Taylor to the monastery did not have any adverse effects upon him whereby he was gravely disabled.

Had there been some evidence to show that the religion in suit here was fraudulent or immoral or illegal, although we are not prepared to say what the effect would be, at least the appellees would have some equity to go on. But in this case they are not even dealing with a helpless child. They are dealing with a person whose resolve is shown by the failure of the deprogramming effort and who escaped back to the monastery as quickly as he could. Taylor lived at the monastery before the deprogramming attempt and was still living there at the time of trial, over four years later. So, therefore, this is a situation in which there is a gross concerted interference with a very fundamental right, the right to choose one's religion, and it is this underlying factor that makes the case actionable, or which greatly aggravates it.

The judgment of the district court should be and the same is affirmed in part and reversed in part. We have affirmed the judgment in the § 1983 claim, and we reject the interference with the right of travel claim advanced on appeal. In examining the allegations pertaining to each named defendant we note that no showing was made below of Dr. Gilmartin's involvement in the false imprisonment claim or in the infliction of emotional distress charge. Therefore as to those two tort claims summary judgment in Gilmartin's favor is affirmed. Judgment in favor of all other defendants on these two tort claims is reversed. Judgment on the claims under § 1985(2) and (3) are reversed as to all defendants. The case shall be remanded for further proceedings, a new trial to a jury, in accordance with the foregoing.