The ESTATE OF Glenn E. BRAS, Deceased, Appellant,

v.

FIRST BANK & TRUST COMPANY OF SAND SPRINGS, Oklahoma, an Oklahoma banking corporation; and Clark Walton, Appellees,

and

W.E. Harvey, the Estate of Jason V. Ott, Deceased, and Prescott, Wright, Snider Company, a Missouri corporation, Defendants.

No. 72659.

Court of Appeals of Oklahoma, Division No. 2.

July 16, 1991.

Certiorari Denied Dec. 3, 1991.

Richard M. Eldridge, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, for appellant.

Donald M. Bingham and Stephanie L. Jones, Chapel, Riggs, Abney, Neal & Turpen, Tulsa, for appellees.

BRIGHTMIRE, Judge.

The genesis of this lawsuit is said to be a conspiracy founded on a tacit understanding among high level bank officials to deceive a recruited borrower. Two of the defendants were granted summary judgment against the borrower generating this ultimate question for review: Whether the bank and its officers demonstrated in the trial court that there existed no material issue of fact requiring a trial to resolve.

We hold they did not and reverse the summary judgment.

## I

The groundwork for this extraordinary scenario features a real-life episodic tragedy. It began on May 26, 1976, when Glenn E. Bras, now deceased, borrowed $240,000, from the First Bank & Trust Company of Sand Springs, Oklahoma, at the behest of his son-in-law, Jason Ott, First Bank's chairman of the board and principal stockholder.[1] The plaintiff alleges that the defendants, acting in concert, fraudulently induced Bras to obligate himself to repay an unsecured $240,000 loan made for the use and benefit of Ott. The latter had induced Bras to take the loan as a favor saying that he wanted the money to take advantage of an undisclosed investment opportunity; that he would repay the loan out of First Bank's funds; and that Bras would not be responsible for repayment.[2]

After the loan documents were signed, Bras received the proceeds and immediately gave Ott a check for $240,000, which in turn was made payable to Prescott, Wright, Snider Company, a banking brokerage house wholly owned by Ott. The laundered money was then transferred by Ott from the brokerage house account to his personal account at the Commerce Bank of Kansas City.

On June 3, 1976, Bras received a statement from the brokerage house showing that he owned 800 shares of stock in a certain company. On June 30, 1976, Ott gave Bras a check for $5,000 for the interest payment on subject note. On July 28, 1976, Bras received a deferral agreement and disclosure statement from First Bank's executive vice-president, Clark Walton, which extended payment on his note from July 26, 1976, until December 6, 1976. Bras signed the agreement and returned it to the bank.

Apparently the money was used by Ott in part to pay off some overdue personal and business obligations owed to the defendant bank. Ott's financial condition, however, continued to deteriorate and became more hopeless during the ensuing weeks until, at last, Ott went off to Iowa. There, on August 10, 1976, he taped a lengthy farewell address to the president of First Bank, William Harvey. Among other things Ott confessed that:

"I received all the proceeds of the funds, committed fraud to him, Glen [*sic*] Bras, by inducing him to buy some bank stock and paid the interest on the loan with a $5,000.00 check. I am sure he cashed the check and then paid Sand Springs [Bank]."

The next day Ott fatally shot himself.

Following Harvey's receipt of the tape from the coroner, the bank sued Bras on the note and recovered a judgment.[3]

Bras' estate alleged in the trial court that Harvey, in his capacity as president of First Bank, had knowledge of the fraud committed by Ott at least at the time the bank sued on the note and that the bank

---

1. This action was brought in 1977 by Glenn E. Bras against First Bank & Trust Co. of Sand Springs, W.E. Harvey, Clark Walton, The Estate of Jason V. Ott, deceased, and Prescott, Wright, Snider Company, a Missouri corporation.

 The action against Ott's estate and the Prescott company was dismissed with prejudice in 1982. On March 15, 1988, the bank and Walton moved for summary judgment. It was sustained October 12, 1988. Such judgment is the subject of this appeal. The case still pends against Harvey.

 Glenn E. Bras died September 19, 1984. Mary Bras in her capacity as personal representative of her late husband's estate filed an application to be substituted as a party plaintiff on October 23, 1987.

2. The petition alleges that repayment of the loan was to come from bank funds. Bras' deposition states that Ott agreed to personally repay the loan and pay the interest.

3. With respect to the $240,000 Bras' note, the bank received from its bonding company $280,-000, in consideration of its assignment of the judgment entered against Bras on the note and a portion of its claim against Ott's estate. At least $91,470 of the proceeds of the tainted note were returned to the bank by Ott as payment of his personal and business loans in default. Thus the bank has realized at least $371,470 as a direct result of the original $240,000 loan to Bras, and the bonding company, by way of assignment, has received an additional $272,660 from the Bras estate from executions on the judgment.

therefore ratified the fraud.[4] The trial court sustained a demurrer to the petition and dismissed the action on the ground that the issues raised by Bras had been previously adjudicated in the action brought by First Bank against Bras. The supreme court granted certiorari, vacated the court of appeals opinion affirming the trial court, and remanded the case for further proceedings. *See Bras v. First Bank & Trust Co.*, 735 P.2d 329 (Okl.1985).

On remand, First Bank and its co-defendant, Clark Walton, moved for summary judgment contending that there was no evidence that the bank or its officers defrauded Bras. They further argued that if Ott had committed fraud, his actions were independently motivated by personal gain and, being outside the scope of his authority, could not be imputed to First Bank.

The trial court found that Ott's tape, if admissible, did not establish First Bank's fraud, but rather that Ott was on a "mission of his own." It also found that there was no evidence that Ott acted on behalf of First Bank or that the bank was aware of or participated in the fraud or that it improved its position by virtue of the loan transaction. In short, the trial court concluded that no material issue of fact existed and that the undisputed facts required the court to hold that no conspiracy existed and no fraud was perpetrated by the bank or any of the defendant officers. The two appellee defendants were consequently granted summary judgment.

Bras' estate appeals urging that material issues of fact exist concerning what the bank officers knew, when they knew it and whether the bank participated in, acquiesced in, received benefit from, or ratified the fraudulent loan in question.

## II

The sole substantive issue to be reviewed, then, is whether material issues of fact exist which prevent a summary judgment against the Bras estate.

We hold such issues do exist. First, it should be noted that the plaintiff alleged a conspiracy among the defendants to defraud the late Glenn E. Bras, along with allegations of fact and circumstances concerning each defendant from which such conspiracy may reasonably be inferred.[5]

Before further discussing the contents of the record, it would be helpful to review the trial court's appraisal of the evidence as set forth in its order sustaining the defendants' motion for summary judgment on October 12, 1988. Said the court: (1) The pre-suicide taped statements are not sufficient to constitute a prima facie case against the bank; (2) the supporting affidavits, documents and answers to interrogatories in the record do not establish a prima facie case against the bank; (3) the plaintiff (Glenn Bras) is deceased and his deposition, which was taken by the bank, does not assist the court in ruling on subject motion; (4) "[t]he actions of Mr. Ott are subject [to] more than one interpretation [and] [r]easonable minds could differ with regard to whether he took advantage of the plaintiff and defrauded him in the purchase of the stock and the proposed business transaction, or ... whether the business opportunity merely went sour and failed;" (5) the plaintiff "lacks convincing evidence that the bank was aware of and participated in the fraud;" (6) if in fact Jason Ott did "defraud the plaintiff ... he was on a 'mission of his own' and ... acting in his own self-interest to liquidate his own debt;" and (7) "[i]t cannot be said [Jason Ott] was acting in behalf of the bank [because] the bank's position did not improve by virtue of the transactions involved. The Court is persuaded by the reasoning applied in *Roring v. Hoggard*, 326 P.2d 812, 813 (Okl. 1958)."

---

**4.** Harvey, who was also a director, admitted executing the check for $240,000 to Bras on May 26, 1976. He recalled Ott telling him that the bank was going to make the loan to Bras if Harvey had no objection, and that Ott had contacted two members of the bank's board of directors who had approved the loan. Harvey could not recall this loan being reviewed by the loan committee which consisted of the officer who initiated the loan request and two officers or members of the board of directors.

**5.** *See Gay v. Akin*, 766 P.2d 985 (Okl.1988).

To determine what legal rights and duties devolve upon and are incidental to the liability of the bank and its officials, one must refer to cases on that subject rather than those dealing with vicarious liability of employers incidental to an employee's tortfeasance, such as *Roring*.[6]

 Perhaps the most definitive case on the subject is *Gay v. Akin*, 766 P.2d 985 (Okl.1988), at least with regard to directors' liability. There the court stated that the common-law duties and liabilities of bank directors essentially parallel the obligations of corporate directors in general. Statutorily imposed duties prescribe only minimum standards and do not relieve bank directors of their common-law obligations. At common law a corporate officer or director was personally liable for the wrongful use of funds entrusted to the corporation if (1) he received any of the money; (2) he participated in the wrongful asset distribution; or (3) being ignorant of the wrongdoing, he was negligent in failing to learn of and prevent it. *Schroeder v. Sanford–Felt Inv. Co.*, 177 Okl. 54, 57 P.2d 601 (1936). The law will not permit an officer or director to escape personal responsibility for his corporation's intentional malfeasance by preserving a state of ignorance through a gross or willful neglect of duties. Corporate officers and directors are presumed to know that which it is their duty to know and about which they have the means of knowing. *Sumner Coal–Mining Co. v. Pleasant*, 127 Okl. 174, 259 P. 1055 (1927). They are required to conduct a bank's business "with prudence, diligence, and the same degree of fidelity and care as an ordinarily prudent man would exercise in the management of his own affairs of like magnitude and importance." *Crews v. Garber*, 188 Okl. 570, 111 P.2d 1080, 1080 (1941). Thus, ignorance resulting from a neglected official duty creates the same liability as actual knowledge. *Preston–Thomas Const. Inc. v. Central Leasing Corp.*, 518 P.2d 1125 (Okl.App.1974).

*Preston–Thomas* further holds that the existence of circumstances and facts which would arouse the suspicions of an ordinarily prudent businessman will furnish a basis for the personal liability of an officer or director who fails to make reasonable inquiry and act with due care regarding the suspicions.

 Another relevant rule is that principals are liable for the torts of their agents in conducting the principal's business and in furtherance of the principal's interest. *Democrat Printing Co. v. Johnson*, 71 Okl. 128, 175 P. 737 (1918), *cert. denied, Glascock v. McDaniel*, 249 U.S. 600, 39 S.Ct. 257, 63 L.Ed. 796 (1919). Thus, a corporation which—after acquiring knowledge of certain unauthorized wrongful acts by its agent—accepts and retains the benefits derived from such wrongful acts, is deemed by law to have ratified the tortious acts, and becomes liable as though authority had been given. And, of course, a corporation can conspire and can commit a tort like any other principal. *Western Homes v. District Court*, 133 Colo. 304, 296 P.2d 460 (1956). Banking corporations are liable for every wrong of which they are guilty, and in such cases the doctrine of ultra vires has no application. *Madison Nat'l Bank v. Lipin*, 57 Mich.App. 706, 226 N.W.2d 834 (1975).

Finally, with regard to conspiracy, the high court of this state committed itself many years ago to the following common-law principles in *Democrat Printing Co.*:
"(1) Syllabus 1.
It is not necessary, in an action on the case in the nature of a conspiracy, to prove by direct evidence that the parties actually came together and entered into a formal agreement to do the thing complained of; but such an understanding may be shown by proof of facts and circumstances from which the existence of a conspiracy may be inferred, and in the admission of circumstantial evidence upon a charge of conspiracy great latitude is allowed. The limit to which evi-

---

**6.** The distinction between the scope of employment and the scope of an agent's authority as well as a corporation's liability for the wrongful acts of its employees are discussed in *Dill v. Rader*, 533 P.2d 650 (Okl.App.1975). *Roring* is among the cases cited.

dence of this kind may be admitted rests in the sound discretion of the trial court. (2) Syllabus 2.

When a conspiracy is entered into to cheat and defraud any person of any property, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their co-conspirators until the object for which the conspiracy was entered into is fully accomplished."

In the body of the opinion, the court said this:

" 'Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a. matter of inference, deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove that the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another part of the same, so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation in the conspiracy may be established without showing his name or giving his description.'

And this is the rule adopted by this court. *Felt v. Westlake et al.*, [68 Okl. 294], 174 Pac. [1041] 1042 [ (1918) ]."

*Democrat Printing Co.*, 175 P. at 738.

■ We turn now to a review of the plaintiff's claim and factual issues generat-ed by the pleadings in light of the foregoing law.

As pointed out by the supreme court in *Bras v. First Bank & Trust Co.*, 735 P.2d 329 (Okl.1985), the plaintiff's action is founded on a conspiracy of the officers and directors of the bank acting on behalf of the bank to defraud Glenn E. Bras. It is of only secondary significance whether the alleged fraud was for the benefit of the bank or Ott or both. The gist of a conspiracy is damages. *Barsh v. Mullins*, 338 P.2d 845 (Okl.1959). The conspiracy to cheat and defraud as alleged by the Bras estate is one in which both its object and the means of attaining it were unlawful. The directors' acts of complicity *vis-a-vis* Ott's fraud were committed while conducting the defendant bank's business, and, in any event, Ott's fraud was later ratified when the bank sued Bras to enforce the note after being advised by Ott of the fraudulent scheme.

Other evidence of the plot is that Ott is said to have obtained advance approval for the Bras loan from two directors. Who they were, what inquiry they made, or what they knew is not shown in the record. Defendant Harvey testified he was told by Ott that two directors had approved the nearly quarter of a million dollar signature loan via telephone and that Ott would like for Harvey to initiate the loan if he had no objection.

President Harvey's testimony further indicated that for longtime customers he had authority to execute signature loans up to $240,000—the maximum the small bank could fund—but only $25,000 for new customers. He said he was in charge of overall day-to-day management of the bank; that Ott took the Bras loan application; and that Harvey was not present when the application was supposed to have been presented to the other directors.

Harvey testified that the only thing he looked at before making the loan was Bras' financial statement; that he did not ask Ott or Bras what the money was to be used for; that he did not ask for the names of the two directors who Ott said had orally

approved the loan; and, of course, that he did not meet with or discuss the matter with them. For a top bank official to issue a check for a maximum loan to a new customer, who he knew was the father-in-law of the bank's chairman of the board, without asking any more about the transaction than Harvey did, is a fact and circumstance from which the jury could infer that he either knew what was going on, or if he did not, that he entertained suspicions which made him not want to know. For under the earlier reviewed law, both president Harvey and executive vice-president Walton had a duty to meet Ott's request with certain basic inquiries of both Ott and Bras, the most important and fundamental of which is: What is the loan going to be used for? There is no reason to believe Bras would not have readily made a full disclosure. Certainly, there is no evidence Bras realized he was participating in an unlawful scheme. The Ott tape indicates the contrary—that Bras was being defrauded—something that could not be if Bras was a knowing participant.

Defendants Harvey and Walton—whose job it was to know about all important goings-on at the bank, which surely would include the making of $240,000 signature loans to a new customer—were charged with the duty of inquiring into and determining why the loan was being sought and made, and what Bras intended to do with the proceeds. Their failure to inquire into such fundamentals under all the circumstances could be found to be a willful breach of their duty to know. And since the officers are presumed to know what a reasonable inquiry would have disclosed, they can be found to have implicitly agreed to become active and vital participants in the fraudulent scheme.

The basic elements of fraud were laid out in *Bras v. First Bank & Trust Co.,* 735 P.2d 329 (Okl.1985). There appears to be evidence to support them. The jury could find that Ott, aided by the contrived ignorance of the defendants, skillfully deceived Bras by suppressing the fact that Ott could not himself legally borrow any more money from the bank; that Bras was being asked to participate in a plan to circumvent the law; that the loan was in fact to pay off Ott's existing overdue $200,000 loan; that Ott's financial status was such that Bras would be left, as it were, twisting in the financial wind; that the defendants had either actual knowledge of the true facts or of sufficient facts to invoke their duty to inquire; that the defendants intended for Bras to act upon the deception; and that Bras did in fact rely on the concealed true facts and was thereby injured. *See* 76 O.S.1981 § 3.

■ And finally, since the summary judgment is being reversed, we will, in the interest of judicial economy, address the trial court's concern about the admissibility of Ott's taped statement. The Ott tape is admissible [7] along with evidence dealing with what inquiries a prudent bank president and executive vice-president would or should make with regard to the making of a maximum loan.

### III

Finally, to protect subject judgment, First Bank advances two procedural contentions: (1) The trial court's denial of Bras' motion for new trial limits appellate review to the issue of whether the lower court acted arbitrarily or committed error as a matter of law, and (2) the motion for new trial lacked the requisite specificity to preserve any allegations for review by this court.

■ Neither point has merit. With regard to the first one, an appellate court, in reviewing the grant of summary judgment, will examine the pleadings and evidentiary materials to determine what facts are material to the cause of action and whether that evidence indicates whether there is a substantial controversy as to any material

---

7. Ott's taped confession is admissible under the "declarations against interest" exception to the hearsay rule. 12 O.S.1981 § 2804(B)(3). Such declaration would subject Ott to criminal liability and is clearly against his penal interest and is unlikely to be deliberately false or needlessly incorrect. *See Howard v. Jessup,* 519 P.2d 913 (Okl.1974).

fact. *Ross v. City of Shawnee,* 683 P.2d 535 (Okl.1984).

And with regard to the second suggestion, the movant is not required to be any more specific than it was. But even if it were otherwise, the deficiency was cured when Bras' motion for new trial and brief in support were filed October 20, 1988. When read together, they present separately stated grounds or reasons in support of the motion and therefore it is in substantial compliance with District Court Rule 17. *See* 12 O.S.Supp.1990, ch. 2, App; *Horizons, Inc. v. KEO Leasing Co.,* 681 P.2d 757 (Okl.1984).

## IV

The summary judgment is reversed and remanded for further proceedings consistent with this opinion.

REIF, P.J., concurs.

RAPP, J., sitting by designation, concurs specially.

RAPP, Judge, specially concurring

While I concur in the result reached by the majority, under *Weeks v. Wedgewood Village,* 554 P.2d 780 (Okla.1976), the acts herein are such that reasonable men could disagree upon the results. Moreover, it would appear Ott knowingly violated established banking rules and regulations, and particularly 12 U.S.C. §§ 375a–375b (1989). These items alone are sufficient to reverse and remand for further proceedings.